**State of CALIFORNIA, et al., Plaintiffs,**

v.

**INFINEON TECHNOLOGIES AG, et al., Defendants.**

**No. C 06–4333 PJH.**

United States District Court, N.D. California.

Aug. 31, 2007.

Charles M. Kagay, Kathleen E. Foote, Office of the Attorney General, Spiegel, Liao & Kagay, LLP, Emilio Eugene Varanini, IV, State Attorney General's Office, San Francisco, CA, Clyde E. Sniffen, Jr., State of Alaska Department of Law, Anchorage, AK, Nancy M. Bonnell, Phoenix, AZ, Bradford Justus Phelps, Office of the Attorney General of Arkansas, Little Rock, AR, Michael Andrew Undorf, Delaware Department of Justice, Wilmington, DE, Emilian Bucataru, Office of the Attorney General, Lizabeth A. Leeds, Antitrust Division Office of the Attorney General State of Florida, Patricia A. Conners, Attorney General's Office, Tallahassee, FL, Rodney I. Kimura, Department of the Attorney General, Honolulu, HI, Brett Talmage Delange, Office of the Attorney General, Boise, ID, Blake Lee Harrop, Office of the Attorney General, Chicago, IL, Jane Bishop Johnson, Louisiana Department of Justice, Baton Rouge, LA, John Robert Tennis, Attorney General, Antitrust Division, Baltimore, MD, D. J. Pascoe, Michigan Department of Attorney General, Lansing, MI, Kristen Marie Olsen, Office of the Attorney General, St. Paul, MN, Bridgette W. Wiggins, Sondra S. McLemore, Mississippi Attorney General's Office, Jackson, MS, Deyonna D. Young, Albuquerque, NM, Todd A. Sattler, North Dakota Office of Attorney General, Bismarck, ND, Thomas A. Bates, Oklahoma Attorney General's Office, Oklahoma City, OK, Tim David Nord, Oregon Department of Justice, Financial Fraud/Consumer Protection, Salem, OR, Alexis Leslie Barbieri, James A. Donahue, III, Jennifer Jane Kirk, Pennsylvania Office of the Attorney General, Harrisburg, PA, C. Havird Jones, Jr., South Carolina Attorney General's Office, Columbia, SC, Victor J. Domen, Jr., Nashville, TN, Ronald J. Ockey, Office of the Attorney General, Salt Lake City, UT, Sarah Oxenham Allen, Office of the Atty. General, Richmond, VA, Brady R. Johnson, Attorney General, Seattle, WA, Douglas Lee Davis, Attorney General, Charleston, WV, Eric J. Wilson, Wisconsin Department of Justice, Gwendolyn J. Cooley, Attorney General, Madison, WI, Christina Moylan, Maine Office of the Attorney General, Augusta, ME, Edmund F. Murray, Jr., Rhode Island Department of Attorney General, Providence, RI, K. D. Sturgis, Raleigh, NC, Maryellen Buxton Mynear, Attorney General, Frankfort, KY, for Plaintiffs.

Joshua Stewart Stambaugh, Kaye Scholer, LLP, Peter Bruce Nemerovski, Steven H. Bergman, Kenneth Ryan O'Rourke, O'Melveny & Myers, LLP, Los Angeles, CA, Joel Steven Sanders, George Charles Nierlich, III, Gibson, Dunn & Crutcher, LLP, Emilio Eugene Varanini, IV, State Attorney General's Office, Joshua David Hess, Gibson, Dunn & Crutcher, LLP, David C. Brownstein, Heller, Ehrman, White & McAuliffe, LLP, Jonathan Edward Swartz, Thelen, Reid, Brown, Raysman & Steiner, LLP, San Francisco, CA, Harrison J. Frahn, IV, Simpson, Thacher & Bartlett, Palo Alto, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

PHYLLIS J. HAMILTON, District Judge.

Defendants' motion to dismiss plaintiffs' complaint came on for hearing before this

court on February 7, 2007. Plaintiffs, forty individual states acting through their Attorneys General, and certain named government entities (collectively "plaintiffs" or "plaintiff States"), appeared through their respective counsel.[1] Defendants appeared through their counsel, Julian Brew, Ronald C. Redcay, Joel S. Sanders, Peter Nemerovski, Kenneth R. O'Rourke, Harrison J. Frahn, Gary L. Halling, and Robert B. Pringle. Having read all the papers submitted and carefully considered the relevant legal authority, the court hereby GRANTS defendants' motion to dismiss in part and DENIES the motion to dismiss in part, for the reasons stated at the hearing, and as follows.

## BACKGROUND

The instant case is closely related to a separate antitrust MDL action that is currently pending before the court, *In re Dynamic Random Access Memory Antitrust Litigation*, M 02–1486 PJH. Both actions generally allege a horizontal price-fixing conspiracy in the U.S. market for dynamic random access memory ("DRAM"), carried out by numerous manufacturer defendants. Whereas the MDL case, however, is comprised of numerous private actions brought by individuals and entities seeking relief against defendants, the present action has been brought by forty individual plaintiff States, acting through their respective Attorneys General, as well as certain government entities located within the forty states.

## A. Background Allegations

DRAM is a semiconductor high-speed memory chip that is used to store electronic data in a wide variety of electronic products, including personal computers and servers. *See* First Amended Complaint ("FAC"), ¶ 9. DRAM is sold worldwide, with the United States DRAM market accounting for a significant share of global DRAM sales—more than $5 billion annually. *See id.* at ¶ 31.

The complaint alleges that over a four year period beginning in 1998, the defendants[2]—various manufacturers of DRAM who collectively control the majority of U.S. DRAM sales—conspired together to unlawfully fix, raise, and maintain the price for DRAM in the U.S. market. *See id.* at ¶ 34. Defendants' conspiracy was allegedly effectuated through coordinated participation in meetings, frequent price communications, and coordinated supply reductions. *See, e.g., id.* at ¶¶ 35–36, 39, 42, 60, 69, 79. Plaintiffs allege that, as a result of defendants' unlawful activity, DRAM prices were artificially inflated during the conspiracy period, forcing consumers and businesses who purchased DRAM during the period to pay more for

---

**1.** For the sake of brevity, the court declines to list herein all plaintiff States and entities represented by way of this action. Plaintiffs' representatives who were present at the hearing, however, included the following: Brad Phelps (AR); Nancy Bonnell (AZ); Kathleen Foote (CA); Emilio Varanini (CA); Michael Undorf (DE); Emilian Bucataru (FL); Rod Kimura (HI); Blake Harrop (IL); Maryellen Mynear (KY); Jane Johnson (LA); John Tennis (MD); Bridgette Williams (MS); Todd Sattler (ND); Deyonna Young (NM); Brian Armstrong (NV); James Roberts (OH); Tim Nord (OR); Alexis Barbieri (PA); Sonny Jones (SC); Jay Smith (SC); Elizabeth Martin (TN); Mark Levy (TX); Ron Ockey (UT); Sarah Allen (VA); Brady Johnson (WA); Gwendolyn Cooley (WI); and Doug Davis (WV).

**2.** The named defendants are: Infineon Technologies AG; Infineon Technologies North America Corp.; Hynix Semiconductor, Inc.; Hynix Semiconductor America, Inc.; Micron Technology, Inc.; Micron Semiconductor Products, Inc.; Mosel Vitelic, Inc.; Mosel Vitelic Corp.; Nanya Technology Corporation; Nanya Technology Corporation USA, Inc.; Elpida Memory, Inc.; Elpida Memory (USA), Inc.; and NEC Electronics America, Inc. (collectively "defendants").

DRAM than they would have in a free and competitive market. *See id.* at ¶¶ 89–91.

Plaintiffs define the victims of defendants' illegal price fixing cartel to include: (1) the plaintiff States themselves, since they were and are "purchasers of electronic products;" and (2) the "end user consumers" in the various plaintiff States, since they, too, are purchasers of electronic products. *See* FAC at ¶ 4. To that end, plaintiff States, acting through their various Attorneys General, proceed against defendants in various representative capacities—i.e., "on their own behalf, and on behalf of state agencies, political subdivisions, natural persons and/or businesses as warranted by federal and state laws." *Id.* In addition, certain state agencies and/or political subdivisions located within the plaintiff States also proceed as named plaintiffs, and are pursuing the instant action in a representative capacity on behalf of similarly situated entities. *See generally* FAC (named plaintiffs include, for example, City and County of San Francisco, County of Santa Clara, and the Los Angeles Unified School District "on behalf of all other political subdivisions similarly situated"); *see also id.* at ¶ 12.

All plaintiffs seek to recover "as damages, restitution, and/or disgorgement of the illegal overcharges that consumers paid as a result of the DRAM manufacturers' price fixing." *See id.*

### B. Plaintiffs' Claims

The instant complaint sweeps broadly. Although it is presented as stating only three "claims for relief," those claims for relief are further divided into several "counts," which collectively state numerous federal and state law claims alleged by varying combinations of different plaintiff groups. *See generally* FAC. Regardless whether styled as a claim for relief or a specific count, each of plaintiffs' grounds for relief is based on the allegations that

defendants engaged in an unlawful conspiracy to restrain trade in the DRAM market:

### 1. First Claim for Relief (Sherman Act)

Plaintiffs' first claim for relief alleges that defendants violated section 1 of the Sherman Act, and is further broken down into three separate counts. *See* FAC at ¶¶ 98–113. Count one alleges a claim by all forty plaintiff States against all defendants, and seeks injunctive relief against them to prevent and restrain the antitrust violations alleged by plaintiffs. Plaintiffs further allege that included among all plaintiff States are both direct and indirect purchasers of DRAM. *See id.* at ¶¶ 101(c), 102.

Count two alleges a claim for damages under section 1 of the Sherman Act, brought by only seven plaintiff States. *See* FAC at ¶¶ 105–108. These seven plaintiff States allege that they are entitled to damages against defendants as direct purchasers of DRAM, by virtue of certain assignment clauses contained in contracts that were entered into between the seven plaintiff States and certain Original Equipment Manufacturers ("OEM"). *Id.*

Count three alleges a claim for damages under section 1 of the Sherman Act, brought by twenty plaintiff States. *See id.* at ¶ 111. As do the plaintiff States who proceed pursuant to count two, these twenty plaintiff States allege that they, too, are entitled to damages as direct purchasers of DRAM from defendants. They do not, however, rely on the same grounds for claiming direct purchaser status. Rather, these twenty plaintiff States at issue allege that they can recover as classic direct purchasers, because their state agencies and/or political subdivisions purchased DRAM directly from defendant Micron,

through one of Micron's company divisions, Crucial Technology. *Id.* at ¶¶ 110–12.

### 2. Second Claim for Relief (Cartwright Act)

Plaintiffs' second claim for relief alleges defendants' violation of California's state antitrust statute, the Cartwright Act. This claim is alleged by seventeen plaintiff States and named plaintiffs the City and County of San Francisco, the County of Santa Clara, and the Los Angeles Unified School District, the latter three proceeding as class representatives for other state agencies and political subdivisions similarly situated. *See* FAC at ¶ 114.

Plaintiffs allege that defendants' unlawful conspiracy was carried out and effectuated within California, and that defendants' conduct within California in turn caused injury to "natural persons and state agencies and political subdivisions" throughout the whole of the United States. *See id.* at ¶ 115. Plaintiffs then divide their Cartwright Act claim in accordance with these three distinct groups of injured parties. Specifically, plaintiffs allege that their Cartwright Act claim is brought: (1) in a parens patriae capacity by the Attorneys General of eight plaintiff States, on behalf of all natural persons in those states; (2) in a parens patriae capacity, *or* in a proprietary/representative capacity, *or* in a class capacity, by the Attorneys General and/or class representatives of sixteen plaintiff States, on behalf of all state agencies in those states; and (3) in a parens patriae capacity, *or* in a proprietary/representative capacity, *or* in a class capacity,

by the Attorneys General and/or class representatives of eleven plaintiff States, on behalf of all political subdivisions in those states.[3] *Id.*

All three plaintiff groups appear to include both direct and indirect purchasers, although this is not entirely clear from the allegations of the complaint.

### 3. Third Claim for Relief (State Antitrust and Unfair Competition Laws)

Finally, plaintiffs' third claim for relief alleges numerous violations of state antitrust and unfair competition laws. The claim is separated into forty separate state law counts, one for each of the forty plaintiff States before the court. *See* FAC at ¶¶ 123 et seq. Depending on the particular plaintiff State at issue in any given count, plaintiffs' state law claims are (a) alleged on behalf of the States themselves, natural persons, state agencies, and/or political subdivisions, (b) brought by the States (and their Attorneys General) by means of parens patriae or class action allegations, and/or (c) cover both direct and indirect purchaser claims. *See id.*

### C. The Instant Motion to Dismiss

Defendants now move to dismiss plaintiffs' complaint in part, pursuant to Federal Rule of Civil Procedure 12(b)(6).[4] Specifically, defendants seek dismissal of plaintiffs' second and third claims for relief. They seek dismissal in part of the former—brought under the Cartwright Act—on grounds that standing to sue un-

---

3. Since the hearing on the defendants' motion to dismiss, three plaintiff States—New Hampshire, Ohio, and Texas—have filed voluntary notices of dismissal, and dismissals were ordered by the court on July 6, 2007, June 25, 2007, and August 15, 2007, respectively. Accordingly, those plaintiff States' claims are no longer at issue, and for purposes of this order, the court omits all reference to them.

4. Defendants have also filed a motion to dismiss similar claims alleged in a separate but related case brought by the New York State Attorney General. *See In re DRAM Antitrust Litigation*, member case no. C 06–6436 PJH, *State of New York v. Micron Technology, et al.* The merits of that motion are discussed by way of a separate order, filed concurrently herewith.

der the Act is generally lacking for non-California persons and entities. They seek dismissal in part of the latter—brought pursuant to state antitrust and consumer protection claims—based on myriad procedural and substantive arguments.

## DISCUSSION

### A. Legal Standard

In evaluating a motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *See, e.g., Burgert v. Lokelani Bernice Pauahi Bishop Trust,* 200 F.3d 661, 663 (9th Cir.2000) (citations omitted). In order to survive a dismissal motion, however, a plaintiff must allege facts that are enough to raise his/her right to relief "above the speculative level." *See Bell Atlantic Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). While the complaint "does not need detailed factual allegations," it is nonetheless "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

In short, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," not just conceivable. *Twombly,* 127 S.Ct. at 1974.

### B. Cartwright Act Claims (Second Claim for Relief)

Defendants challenge nearly the whole of plaintiffs' second claim for relief, seeking dismissal of every claim stated therein by all non-California plaintiffs. Those claims, all brought pursuant to California's Cartwright Act, are alleged in a variety of representative capacities on behalf of natural persons, state agencies, and political subdivisions. *See, e.g.,* FAC at ¶¶ 114–21. Defendants seek dismissal based on three overriding arguments. First, they argue that the six plaintiff States pursuing parens patriae claims on behalf of non-California residents lack standing to do so under the Cartwright Act. Second, defendants contend that the twelve plaintiff States pursuing representative claims on behalf of non-California government agencies—i.e., state agencies and political subdivisions—also lack standing to bring such claims under the Act. Third, defendants assert that, in addition to lack of standing under the Cartwright Act itself, none of the plaintiff States at issue authorize their Attorneys General to bring suit under the Cartwright Act in the first place.

#### 1. *Non–California Claims on Behalf of Natural Persons/Businesses*

■ Six plaintiff States—Kentucky, Louisiana, North Dakota, the Northern Mariana Islands[5], South Carolina, and Utah—assert parens patriae claims under the Cartwright Act on behalf of all natural persons. *See* FAC at ¶ 115. Defendants, however, contend that the Cartwright Act does not authorize parens patriae actions brought by non-California Attorneys General on behalf of non-California residents. Defendants argue that the plain language of the Cartwright Act itself restricts parens patriae claims to those brought exclusively by the California Attorney General, exclusively on behalf of California residents.

Defendants are correct. In the section of the Cartwright Act specifically addressing Attorney General enforcement suits brought as parens patriae actions, the Act provides: "[t]he Attorney General may

---

**5.** For purposes of the instant order, the court refers to plaintiff Northern Mariana Islands as a plaintiff "State."

bring a civil action in the name *of the people of the State of California,* as parens patriae on behalf of natural persons *residing in the state,* in the superior court of any county which has jurisdiction of a defendant, to secure monetary relief as provided in this section *for injury sustained by those natural persons* to their property by reason of any violation of this chapter ...". *See* Cal. Bus. & Prof.Code § 16760(a) (1) (emphasis added). This provision could not be plainer: where the Attorney General is empowered to bring a damages action seeking relief for violation(s) of the Cartwright Act, it is only the *California* Attorney General who is so empowered, and on behalf of *California* residents only. The out-of-state Attorneys General therefore have no parens patriae authority under the Act.

Plaintiffs, for their part, have submitted no legal authority expressing a contrary view of section 16760, nor do their opposing arguments persuade the court to find otherwise. Plaintiffs argue, for example, that even if the above conclusion is true, out-of-state Attorneys General may still bring suit under the general enforcement provision of the Act, which provides a private right of action to "any person" injured under the Act. *See* Cal. Bus. & Prof.Code § 16750(a) ("Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor"). According to plaintiffs, their parens patriae action should be considered nothing more than a procedural device, similar to a class action, which *could* be filed on behalf of natural non-residents under the Cartwright Act. For support, plaintiffs rely on California case law purportedly holding that class actions under the Cartwright Act are not precluded. *See, e.g., Bruno v. Superior Court,* 127 Cal.App.3d 120, 134–35, 179 Cal.Rptr. 342 (Cal.Ct.App.1981). However, while plaintiffs are generally correct that *Bruno* sanctions the use of

private class actions under the Cartwright Act, this in no way establishes that parens patriae actions should also be allowed pursuant to the Cartwright Act's private right of action provision. This is because a parens patriae action is expressly defined as a means for a state to seek redress for wrongs affecting the *public* at large, while a class action is generally a means by which individual *private* rights may be collectively enforced. *See, e.g., Hawaii v. Standard Oil,* 405 U.S. 251, 257–58, 266, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Plaintiffs have furthermore failed to present the court with any legal authority holding that parens patriae actions *are* the same as class actions, for purposes of maintaining a private right of action under the Cartwright Act. Accordingly, and without express authority adopting plaintiffs' position, the court will not assume that out-of-state parens patriae actions are specifically contemplated by the Cartwright Act's private enforcement provisions.

Plaintiffs also contend that sections 16750(e) and 16760(f) of the Cartwright Act authorize the non-California parens patriae claims before the court. This is wrong. Section 16750(e) permits the Attorney General to enter into contracts and cooperate with private parties and other government entities bringing antitrust actions. *See* Cal. Bus. & Prof.Code § 16750(e) ("In any action brought by the Attorney General pursuant to either state or federal antitrust laws ... the Attorney General may enter into contracts relating to the investigation and the prosecution of such action with any other party plaintiff who has brought a similar action ..."). However, there is no legal authority that affirmatively interprets this statute as granting express parens patriae authority to non-California Attorneys General acting on behalf of non-California residents. Nor is such an interpretation warranted. The plain language of section 16750(e) avoids

mention of parens patriae authority altogether, and merely grants the California Attorney General the right to cooperate with other plaintiffs in jointly investigating and/or prosecuting cases in which the other plaintiffs have brought "similar action[s] for the recovery of damages." *See id.* In other words, the California Attorney General is empowered to cooperate with other plaintiffs who have already, and independently, filed a similar claim. It does not work the other way around—i.e., other party plaintiffs are *not* authorized to state a claim under the Cartwright Act, simply because they agree first to cooperate with the California Attorney General as part of the Attorney General's prosecution of an action under the statute. Even assuming, therefore, that the non-California Attorneys General here do, in fact, proceed jointly with the California Attorney General pursuant to section 16750(e) of the Act, this provision grants them no greater authority than they otherwise would have under the Act.

Furthermore, plaintiffs' reliance on section 16760(f) of the Act is similarly misplaced. This provision states that the parens patriae powers enumerated in that section "are in addition to and not in derogation of the powers granted to the Attorney General by common law with respect to bringing actions parens patriae." *See* Cal. Bus. & Prof.Code § 16760(f). Plaintiffs rely on this language for proof that plaintiffs' authority to bring a parens patriae suit under the Act is to be found in the common law parens patriae powers vested in all Attorneys General—which the Act itself recognizes. This argument, however, is inapposite. Section 16760(f) is but one provision contained within the broader section 16760—the Attorney General enforcement provision. As such, and when viewed in the larger context of the section as a whole, section 16760(f) is more correctly viewed as a modifier to the broader section, which is limited to actions

by the California Attorney General, as noted above. *See generally* Cal. Bus. & Prof. Code § 16760. In other words, the lesser provision relates only to those common law powers granted to the California Attorney General, not to out-of state Attorneys General.

Finally, plaintiffs assert that parens patriae authority on behalf of out-of-state residents is suggested by the California Supreme Court's holding in *Pacific Gas & Electric Co. v. County of Stanislaus,* 16 Cal.4th 1143, 69 Cal.Rptr.2d 329, 947 P.2d 291 (1997). But this argument, too, fails. *Pacific Gas & Electric* engaged in an exhaustive review of the statutory language of the Cartwright Act, and specifically of the provisions of the Act that discuss the Attorney General's capacity to sue under the Act. *See, e.g., id.* at 1153, 69 Cal. Rptr.2d 329, 947 P.2d 291. The court found that the statute was to be interpreted expansively, and in such a way that a county should be deemed able to bring a representative action under the Act, even though counties are not explicitly referenced in the Act. *See id.* at 1154–55, 69 Cal.Rptr.2d 329, 947 P.2d 291. However, the case provides no support for plaintiffs' sweeping conclusion that out-of-state Attorneys General should likewise be allowed to bring suit under the Act. Indeed, even though construing the Act broadly, the *Pacific Gas & Electric* court specifically referred to the Act as recognizing "that not only the Attorney General and local district attorneys, but also 'any county, city, public corporation or public district *of this state,*' may bring a civil action under the Cartwright Act." *Id.* at 1157, 69 Cal. Rptr.2d 329, 947 P.2d 291 (emphasis added). At no time did the court refer to out-of-state entities, let alone did it touch upon the ability of such entities to state claims under the Act—in a parens patriae capacity or otherwise. The California Supreme court having declined to so construe the

Act there, this court will refrain from such a holding here.

Accordingly, the Cartwright Act claims asserted by plaintiff States Kentucky, Louisiana, North Dakota, the Northern Mariana Islands, South Carolina, and Utah on behalf of natural persons and/or residents, are hereby DISMISSED for lack of standing under the Cartwright Act.

### 2. *Non–California Claims on Behalf of Government Entities*

There are 12 non-California plaintiff States' Attorneys General who assert claims pursuant to the Cartwright Act in a parens patriae, proprietary, and/or class capacity, on behalf of state agencies and political subdivisions (collectively "government entities").[6] *See* FAC at ¶ 115. Defendants seek dismissal of all these claims, once more arguing that standing is lacking under the Cartwright Act. They contend that the non-California government entities do not constitute "persons" authorized to bring suit under the Cartwright Act. To that end, defendants seek dismissal of all claims brought on behalf of government entities by the Attorneys General of plaintiff States Alaska, Delaware, Hawaii, Kentucky, Louisiana, Northern Mariana Islands, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Utah, and Virginia.

Defendants contend, as they did with respect to their arguments in support of dismissing non-California claims on behalf of natural persons, that the provisions of the Cartwright Act expressly contemplate that only California's government entities may sue under the Act, and that only the California Attorney General may sue as parens patriae on their behalf. Plaintiffs, for their part, respond with the argument that California state cases have interpreted the Cartwright Act to allow suit by out-of-state government plaintiffs to the same extent as any other "person" under the Act.

Defendants once again have the better argument. Beginning, as the court must, with the language of the Cartwright Act, its plain meaning is that only California government entities are granted standing to sue as "persons" under the Act. Section 16750, for example—the civil enforcement provision that plaintiffs rely on for authority—provides that "[a]ny person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor ...". *See* Cal Bus. & Prof.Code § 16750(a). The term "person" is, however, specifically defined elsewhere in the Act to include "corporations, firms, partnerships and associations existing under or authorized by the laws of this State *or any other State....*" *See id.* at § 16702 (emphasis added). Accordingly, standing to sue under this provision of the Act is granted to all natural persons, corporations, firms, partnerships and associations—regardless whether they are California residents or not.

While government entities are not included in this group of permissible plaintiffs, this does not mean that they are precluded from bringing suit. Rather, the California legislature saw fit to authorize government entities to bring suit by way of a separate provision, codified at section 16750(b) of the Cartwright Act. That provision expressly states that the term "person," as set forth within the civil enforcement provision of section 16750, shall be deemed to include "[t]he [S]tate and any of its political subdivisions and public agencies." Cal. Bus. & Prof.Code § 16750(b). The meaning of this language is clear: the California Attorney General, and any of its

---

**6.** Specifically, plaintiffs assert claims on behalf of 12 plaintiff States' state agencies, and on behalf of 9 plaintiff States' political subdivisions. *See* FAC at ¶ 115.

political subdivisions and public agencies, also have standing to bring suit under the Act.

Out-of-state government entities, however, do not. Section 16750(b) expressly limits the government entities authorized to bring suit to "[t]he [S]tate"—i.e., California—and *its* agencies and subdivisions. *See id.* The California legislature knew how to include out-of-state government entities as "persons" capable of suit, had it wanted to. After all, it had previously defined "person" to include out-of-state "corporations, firms, partnerships and associations." *See id.* at § 16702. Thus, its failure to broaden the definition of "person" to include out-of-state government entities under section 16750(b) is logically viewed as proof that the legislature did *not* intend for these entities to be included in the group of potential plaintiffs capable of bringing suit pursuant to the Cartwright Act's enforcement provisions.

In the face of the Cartwright Act's express language limiting suit on behalf of government entities to California and its Attorney General, plaintiffs' citation to alternative case law in support of a contrary conclusion is unpersuasive.

Plaintiffs rely, for instance, on *FTC v. MTK Mktg. Inc.*, for the proposition that out-of-state government plaintiffs should be treated as "persons" under a given statute, wherever that statute refers to the phrase "person." *See* 149 F.3d 1036 (9th Cir.1998). In *MTK Mktg.*, the Ninth Circuit interpreted a California statute relating to bond enforcement, and found that a federal government agency could constitute a "person" within the meaning of the statute. *See id.* at 1039. Plaintiffs are correct that the Ninth Circuit there reasoned that, in the face of statutory language that seemingly defined "person" to include only the state and its political subdivisions and agencies, the court should nonetheless interpret the statute in a man-ner that treated the federal government in the same manner as the state government, absent some indication of legislative intent. *Id.* To that end, the Ninth Circuit construed "person" to include the federal government agency.

This reasoning does not apply here, however. For unlike the statute at issue in *MTK Mktg.*, the Cartwright Act here explicitly distinguishes between out-of-state corporations, firms, partnerships and associations who *can* sue, and those out-of-state government entities who *cannot*. *See* Cal. Bus. & Prof.Code 16702, 16750(b, c). Moreover, defendants' citation to legislative history further supports the conclusion that the legislature did, in fact, intend to include only California government agencies as "persons" capable of suit under the Cartwright Act. *See* Nemerovski Decl. ISO Defendants' Motion to Dismiss ("Nemerovski Decl."), Ex. 7 at 23–24. Accordingly, all indications here are that the California legislature did not intend to grant out-of-state government entities standing to sue under the Cartwright Act. And as the Ninth Circuit in *MTK Mktg.* indicated, courts should defer to the legislative intent behind statutes, where ascertainable.

Plaintiffs also rely on cases construing the Sherman Act, in which courts conclude that state government entities are "persons" capable of suit under the Act. This reliance is misplaced, however, as these cases are not controlling here. It is true enough that the Sherman Act ordinarily provides helpful guidance in construing state antitrust laws that are modeled on the Sherman Act. However, as even the California Supreme Court has explicitly noted, this is not necessarily so where the Cartwright Act is concerned. *See California v. Texaco*, 46 Cal.3d 1147, 252 Cal. Rptr. 221, 762 P.2d 385 (1988) (noting that, contrary to popular belief, Cart-

wright Act was modeled on Texas state law rather than federal antitrust law, and holding Sherman Act cases to be not directly probative regarding Cartwright Act interpretation). Even if the court *were* to rely on case law interpreting the Sherman Act, the cases are not actually supportive of the point urged by plaintiffs. This is because, while the cases plaintiffs rely on do construe state governments as "persons" for purposes of section 4 of the Clayton Act—the Sherman Act's enforcement provision—the Clayton Act is distinguishable from the Cartwright Act. Specifically, the Clayton Act does not contain any provision expressly defining or limiting the types of government entities who may sue under the Act. The Cartwright Act, as already explained above, does. *See* Cal. Bus. & Prof.Code 16750(b) ("The [S]tate and any of its political subdivisions and public agencies shall be deemed a person within the meaning of this section".). Moreover, the Sherman Act cases relied on by plaintiff consider only whether state governments may sue under the Act in their own names, and do not consider the precise issue here—i.e., whether the state government may sue on behalf of further removed state agencies and political subdivisions. All of the foregoing suffices to distinguish the Sherman Act cases from the case at bar.

In sum, then, the court's consideration of the statutory language of the Cartwright Act and its supporting legislative history persuade the court that the Cartwright Act was not intended to, and by its language does not, support the inclusion of out-of-state government entities as "persons" capable of suit under the Act, and

upon whose behalf the plaintiff States in question may sue.

Accordingly, defendants' motion to dismiss on this ground is granted, and plaintiffs' Cartwright Act claims brought on behalf of government entities by the Attorneys General of plaintiff States Alaska, Delaware, Hawaii, Kentucky, Louisiana, Northern Mariana Islands, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Utah, and Virginia, are hereby DISMISSED.

### 3. *Individual State Law Authorization for Cartwright Act Claims*

Finally, defendants also argue that, in addition to the language of the Cartwright Act itself, a further reason supports dismissal of *all* non-California plaintiff States' claims, on behalf of both natural persons and government entities: namely, that these plaintiff States do not authorize their Attorneys General to bring suit on behalf of persons or government entities pursuant to another state's laws.[7] Defendants look to the states' governing antitrust laws in particular, and note that their plain statutory language restricts suits on behalf of natural persons and government entities to violations of state antitrust law and in some instances, federal law, and does not permit suits for violation of *foreign* states' antitrust laws. *See, e.g.,* Alaska Stat. § 45.50.577(a-b); Del.Code Ann. tit. 6 §§ 2105, 2108; Haw.Rev.Stat. § 480–14(b); Ky.Rev.Stat. Ann. § 367.200; La.Rev.Stat. Ann. §§ 51:128, 51:138; N.D. Cent.Code § 51–08.1–07; 4 N. Mar. I.Code § 5206; Okla. Stat. tit. 79 § 205; 71 Pa. Stat. Ann. § 732–204; R.I. Gen. Laws § 6–36–11(b);

---

**7.** Defendants seek dismissal on this ground of the following plaintiff States' claims on behalf of natural persons: Kentucky, Louisiana, North Dakota, Northern Mariana Islands, and South Carolina. Defendants seek dismissal of the following plaintiff States' claims brought

on behalf of government entities: Alaska, Delaware, Hawaii, Kentucky, Louisiana, Northern Mariana Islands, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Utah, and Virginia. *See* FAC at ¶ 115; Def. Mot. to Dismiss at 19:9–11, 21:27–25:12.

S.C.Code Ann. § 39–3–190; Va.Code Ann. § 59.1–9.15(a, c).

In response, plaintiffs contend that reliance on antitrust statutes alone is insufficient, as the plaintiff States' Attorneys General are authorized to bring Cartwright Act claims on behalf of residents and government entities by virtue of the powers and duties vested in them by other sources. *See, e.g.,* Del.Code Ann. tit. 29, § 2504(3); Ky.Rev.Stat. § 15.020; N. Mar. I. Const. Art. III, § 11; N.D. Cent.Code § 54–12–02; Okla. Stat. tit 74 § 18b; Utah Code Ann. § 76–10–916(3). Plaintiffs also urge the court to place the burden on defendants to prove that the individual plaintiff States affirmatively *prohibit* their Attorneys General from bringing Cartwright Act claims, rather than requiring plaintiffs to prove that state laws *allow* them to file such claims.

Defendants are correct, in the first instance, that the statutory language of the various state antitrust statutes at issue limits suits brought by the various State Attorneys General to suits for violation of their own antitrust laws and in some instances, federal law. *See, e.g.,* Alaska Stat. § 45.50.577(a-b) (authorizing Attorney General to bring civil action on behalf of government entities to secure monetary relief *"by reason of any violation of AS 45.50.562–45.50.570"*) (emphasis added); Haw.Rev.Stat. § 480–14(b) (authorizing Attorney General action on behalf of government agencies "to recover the damages *provided for by this section, or by any comparable provisions of federal law"*)

(emphasis added). There is no language in any of the antitrust statutes, nor can plaintiffs point to any, that expressly authorizes any State Attorney General to bring suit for antitrust violations pursuant to a foreign state's statute.[8]

Plaintiffs instead rely on alternative sources of authority—such as general enforcement provisions, common law, and/or state constitutional provisions—in order to invoke the authority that is lacking in the antitrust statutes themselves. *See, e.g.,* Del.Code Ann. tit. 29, § 2504(3) (general empowerment statute authorizing Attorney General to "exercise all such power and authority as the public interest may from time to time require"); *Commonwealth v. Meadow Gold Dairies, Inc.,* 1993 WL 476633, *3 (W.D.Va.1993) (recognizing common law powers of Virginia Attorney General in bringing federal Sherman Act claim in addition to state antitrust claim); La. Const. Art. IV, § 8 ("As necessary for the assertion or protection of any right or interest of the state, the attorney general shall have authority (1) to institute, prosecute, or intervene in *any civil action* or proceeding . . .") (emphasis added). According to plaintiffs, these alternative sources establish the right of the Attorneys General of the various states to do everything in their power to represent the interests of the residents and entities within their states, and this must necessarily include the ability to institute civil actions pursuant to another state's antitrust law.

---

**8.** The only exception to this is Utah's antitrust statute, which, as plaintiffs point out, does contemplate suit by the Attorney General pursuant to "any" law. *See* Utah Code Ann. § 76–10–916(3) ("The attorney general may proceed under *any antitrust laws in the state or federal courts* on behalf of this state, any of its political subdivisions or agencies, or as parens patriae on behalf of natural persons in this state.") (emphasis added). Despite this

expansive language, however, the Cartwright Act is nonetheless unavailable to plaintiff State Utah, for the reasons given above in connection with standing under the language of the statute itself. This result applies to parens patriae claims brought by Utah on behalf of residents, as well as claims brought on behalf of government entities. *See* FAC at ¶ 115.

The problem with plaintiffs' argument, however, is that while the types of authorities they cite do generally establish the ability of the State Attorneys General to do their utmost to institute and prosecute suits in order to protect the well-being of their state's residents and entities, those authorities also appear to contemplate that such representative suits will be prosecuted under the laws of their own state, or in some instances, federal law. Not a single source relied on by plaintiffs expressly provides or even implies that a representative action by an Attorney General may be brought pursuant to *another* state's laws, let alone California's antitrust law specifically. Nor could the court find any such authority. Indeed, even the most expansive of the general empowerment statutes relied on by plaintiffs, while recognizing the Attorney General's ability to bring actions in out-of-state courts, stops short of actually authorizing the Attorney General to bring actions in out-of-state jurisdictions *pursuant to* out-of-state laws. *See, e.g.,* Ky.Rev.Stat. § 15.020 (general rights and duties provisions establishing that Attorney General "shall also commence all actions or enter his appearance in all cases, hearings, and proceedings in and before all other courts, tribunals, or commissions in *or out of the state,* and attend to all litigation and legal business *in or out of the state* required of him by law, or in which the Commonwealth has an interest") (emphasis added).

This being the case, the court declines plaintiffs' invitation to find that the majority of plaintiff States' Attorneys General are authorized, pursuant to their own state laws, to bring suit pursuant to California's Cartwright Act, in addition to pursuing their own state law claims. In so holding, the court has also declined plaintiffs' invitation to place upon defendants the burden of persuading the court that the plaintiff States affirmatively *prohibit* their Attorneys General from bringing representative Cartwright Act claims, and has instead placed upon plaintiffs the burden of persuading the court that state laws *allow* them to file the instant claims. This is because, as the court has stated on prior occasions in connection with related litigation, the court desires to avoid making affirmative pronouncements regarding state law that would have the effect of substantially broadening the legal rights available pursuant to that law, without some indication that such a result has been expressly contemplated by the courts of a given state.

A conservative approach is also warranted, in the court's view, given the basic nature of representative and/or parens patriae actions instituted by State Attorneys General. Parens patriae actions, for example, are unique vehicles that allow states to vindicate "quasi-sovereign interests"—such as interests in the physical and economic health and well-being of state residents and/or entities. *See, e.g., Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). And while neither party before the court has expressly raised the issue, it appears to the court that an inherent presumption in state actions brought to vindicate "quasi-sovereign" interests is that a state will necessarily vindicate those interests through enforcement of its own state—or, where warranted, federal—laws, given that the persons and entities from whom the state's quasi-sovereign interests stem, and the authority for vindicating such interests, are both rooted in the state itself and by extension, within its boundaries. Here, because of the unduly broad nature of plaintiffs' allegations, it is impossible for the court to tell at this juncture whether plaintiffs are in fact asserting a parens patriae claim, a specifically defined "representative" claim, or a class claim on behalf of both natural per-

sons and government entities. *See* FAC at ¶ 115 (asserting Cartwright Act claim on behalf of non-California state agencies and political subdivisions "in *either* a parens patriae, a proprietary/representative, *or* a class capacity") (emphasis added). However, in view of plaintiffs' alternative allegations, the concerns just noted counsel in favor of a conservative approach to the question whether the non-California State Attorneys General have been expressly authorized to bring suit pursuant to the Cartwright Act.

In sum, therefore, the court concludes that the state laws of Alaska, Delaware, Hawaii, Kentucky, Louisiana, North Dakota, Northern Mariana Islands, Oklahoma, Pennsylvania, Rhode Island, South Carolina, and Virginia also fail to provide the necessary standing for the plaintiff States' Attorneys General to bring their Cartwright Act claims on behalf of natural persons and/or government entities. Accordingly, these claims are DISMISSED on this ground, in addition to lack of standing under the Cartwright Act itself.

### C. State Antitrust and Unfair Competition Claims (Third Claim for Relief)

Defendants also challenge the state law claims that are alleged by way of forty separate counts in plaintiffs' third claim for relief. Plaintiffs' claims are rooted in either state antitrust statutes, or state unfair competition/consumer protection statutes, or both. Regardless of the source of plaintiffs' claims, defendants target the majority. They argue that dismissal in whole or in part is required, for one or more of the following four reasons:[9] (1) the *Illinois Brick* doctrine bars certain state law claims that seek recovery on

behalf of indirect purchasers; (2) certain state law claims are barred because plaintiffs have failed to allege any intrastate activity, as required pursuant to state law; (3) that certain state law claims are barred by the applicable statutes of limitations; and (4) certain state law claims alleging parens patriae authority on behalf of natural persons and businesses are deficient, because plaintiffs lack the parens patriae capacity to sue for monetary damages on behalf of those entities.

#### 1. *Illinois Brick*

Defendants urge the court to dismiss several plaintiff States' claims brought pursuant to their own antitrust and/or unfair competition/consumer protection statutes. They argue that, to the extent plaintiffs seek recovery for indirect purchasers pursuant to these statutes, relevant laws of these states specifically prohibit or limit indirect purchasers from bringing antitrust suits, in accordance with *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). According to defendants, since these states follow *Illinois Brick's* general prohibition on indirect purchaser suits alleging antitrust violations, the indirect purchaser relief plaintiffs seek here is improper. Defendants argue that, on this basis, the indirect purchaser claims brought by Alaska, Arkansas, Florida, Hawaii, Kentucky, Louisiana, Maryland, Oklahoma, Virginia, Washington, and West Virginia must be dismissed.

#### a. Alaska

■ Plaintiffs allege claims pursuant to Alaska's Monopolies and Restraint of Trade Act, as well as Alaska's Unfair Trade Practices and Consumer Protection

**9.** Defendants originally moved to dismiss plaintiffs' claim for disgorgement or restitution pursuant to Texas state law. However, in view of the court's August 15, 2007 order granting plaintiff State Texas' voluntary dismissal of its claims, defendants' argument is now moot.

Act ("AUTPCPA"). *See* Alaska Stat. § 45.50.562 et seq.; § 45.50.471 et seq.; *see also* FAC at ¶¶ 123–28. Specifically, plaintiffs seek relief—through Alaska's Attorney General—on behalf of the state, and as parens patriae on behalf of state agencies, political subdivisions, and natural persons. *See* FAC at ¶¶ 125–27.

Defendants target all of these claims to the extent they seek relief on behalf of indirect purchasers. They contend that Alaska's antitrust statute does not cover indirect purchaser claims that are based, as here, on conduct occurring prior to July 1, 2003, and that Alaska's consumer protection statute cannot be used as an alternative to circumvent the prohibition imposed by the state's antitrust statute. In response, plaintiffs recognize that Alaska did not enact a law granting indirect purchasers standing to sue until July 1, 2003, but they assert that indirect purchaser standing under both the antitrust and consumer protection statutes was nonetheless recognized prior to passage of the 2003 law.

Beginning with Alaska's antitrust statute, both parties acknowledge that the statute was amended in 2003 to expressly allow for indirect purchaser standing. The amended statute now empowers the Attorney General—and the Attorney General alone—to seek monetary relief on behalf of indirect purchasers. *See* Alaska Statute § 45.50.577(i) ("Only the attorney general, in a suit brought under this section, may seek monetary relief for injury indirectly sustained for a violation of [the Act]"). Plaintiffs are therefore generally correct that Alaska's antitrust statute would normally permit suit by the Attorney General for monetary relief on behalf of indirect purchasers. However, this is not the case here. For as defendants point out, the historical and legislative notes to the statute indicate that the amended provision of the statute governing Attorney General

actions applies "to civil actions alleging a violation of [the state antitrust statute] that occurred *on or after July 1, 2003.*" *See id.* (editor's notes to the statute) (emphasis added). Plaintiffs' complaint alleges violations of the antitrust statute that occurred between 1998 and 2002. *See* FAC at ¶¶ 96, 99. Accordingly, plaintiffs' allegations are not covered by the amended provision of the statute that would allow the Alaska Attorney General's suit to go forward on behalf of indirect purchasers.

Plaintiffs attempt to avoid this conclusion by arguing that, even prior to passage of the amended provision discussed above, Alaska's antitrust statute was already construed to allow for suits by the Attorney General on behalf of indirect purchasers. Plaintiffs would invoke this prior authority as alternative grounds for the instant suit on behalf of indirect purchasers. The court, however, is unpersuaded by these arguments. The obvious implication of Alaska's amendment to its antitrust statute is that, prior to amendment, no indirect purchaser standing existed under the statute. Else, there would have been no need to amend the statute to permit indirect purchaser claims. This conclusion is further buttressed by the fact that the editor's notes to the statute explicitly state that the amended statute applies *prospectively* to conduct occurring *after* July 1, 2003.

Having concluded, therefore, that the instant claims by the Alaska Attorney General on behalf of indirect purchasers are barred under the state's antitrust statute, the issue remains whether the Attorney General may nonetheless bring indirect purchaser claims pursuant to the state's unfair competition statute.

The AUTPCPA provides: "A person who suffers an ascertainable loss of money or property as a result of another person's act or practice declared unlawful [under

AUTPCPA] may bring a civil action to recover for each unlawful act or practice three times the actual damages or $500, whichever is greater." *See* Alaska St. § 45.50.531. There is nothing in the statute's language or definitions that specifically designates either direct or indirect purchasers as "persons," or that distinguishes between the two. Nor has either party submitted any controlling case authority directly on point as to this issue, although plaintiffs have pointed to one case that provides persuasive authority for the argument that the Alaska Attorney General may seek restitution on behalf of indirect purchasers under the unfair competition statute. *See FTC v. Mylan Labs., Inc.*, 99 F.Supp.2d 1, 5 (D.D.C.1999). The court does not find *Mylan* instructive, however, in light of the fact that the *Mylan* case predated Alaska's 2003 amendment to its antitrust statute, and did not contain any discussion of indirect purchaser standing under AUTPCPA in light of the state's *Illinois Brick* policy. Specifically, the facts of the *Mylan* case provided no occasion for that court to consider—as is squarely before the court here—the wisdom of allowing plaintiffs' claims to proceed under Alaska's consumer protection statute where those exact same claims were explicitly barred under the state antitrust statute.

As such, and furthermore recognizing that this court is not in the best position to decide unresolved legal issues for the State of Alaska, the court adopts—as it has done previously—the interpretation that will wreak the least amount of havoc on the existing law in Alaska. To that end, the court declines to read AUTPCPA to permit the Attorney General to assert indirect purchaser claims here, since no court has affirmatively found to the contrary, and since, under the current status of the antitrust laws in Alaska, the Attorney General may only seek relief on behalf of indirect

purchasers for conduct that is alleged to have occurred after July 1, 2003.

For the above reasons, the court concludes that the indirect purchaser claims brought by the Attorney General pursuant to Alaska's antitrust and consumer protection statutes must be, and hereby are, DISMISSED.

### b. Arkansas

■ Plaintiffs also assert claims under Arkansas law pursuant to the state's antitrust and consumer protection statutes. *See* Ark.Code Ann. § 4–75–301 et seq. (Arkansas Unfair Practices Act ("AUPA")); Ark.Code Ann. § 4–88–101 et seq. (Arkansas Deceptive Trade Practices Act ("ADTPA")); *see also* FAC at ¶ 130. Acting through the Arkansas Attorney General, they seek relief for plaintiff State Arkansas, its state agencies, and its natural persons. FAC at ¶ 130.

Defendants once again target the indirect purchaser claims. As they did with respect to plaintiffs' claims under Alaska law, defendants argue that Arkansas' antitrust statute was only recently amended to allow the Attorney General to sue on behalf of indirect purchasers, and that this amendment did not become effective until April 8, 2003—thereby failing to cover the pre–2003 conduct alleged by plaintiffs here. *See* Ark.Code Ann. § 4–75–315(b) ("The Attorney General also may bring a civil action in the name of the state, as parens patriae on behalf of natural persons residing in this state, to secure monetary relief as provided under this section for injury, directly or indirectly sustained by those persons ...") (effective April 8, 2003). This being the case, defendants contend that the indirect purchaser claims are barred under the Arkansas antitrust statute, and that such claims under the state's consumer protection statute should also be barred, lest plaintiffs be allowed to

circumvent the *Illinois Brick* policies contemplated by the antitrust statute.

Although these arguments were persuasive with respect to claims under Alaska's state laws, they are not similarly persuasive here. For as plaintiffs point out, the Arkansas antitrust statute here is not as narrow as Alaska's antitrust statute. This is because the 2003 version of the Arkansas antitrust statute—including its amendments—does *not* explicitly apply only to violations occurring *after* its enactment. Rather, the Arkansas statute elsewhere merely indicates that it does not "allow for the commencement of any action by the Attorney General under the provisions of [the Act] for events occurring prior to [April 8, 2003] *of which the Attorney General had actual knowledge.*" *See* Ark. Code Ann. § 4–75–320(c). Thus, as plaintiffs argue, a fair reading of the amended statute is that it applies to actions commenced by the Attorney General that allege conduct occurring *prior* to April 8, 2003, but only where the Attorney General had no actual knowledge of the conduct at the time.

Pursuant to this plain reading of the statute, plaintiffs' claims here on behalf of indirect purchasers pass muster. For there are no allegations anywhere in plaintiffs' complaint indicating that the Arkansas Attorney General had actual knowledge of defendants' allegedly unlawful conduct. To be sure, plaintiffs' complaint comes close to alleging as much in the section of the complaint that alleges defendants' fraudulent concealment of their activities. *See* FAC at ¶¶ 4, 40, 84 (defendants concealed their conduct "[f]rom approximately 1998 to June of 2002"). However, although defendants argue that these fraudulent concealment allegations are sufficient to demonstrate that the Attorney General had actual knowledge of defendants' purported antitrust violations—and thus, that the

amended statute does not apply—the court is not convinced. The fraudulent concealment allegations state only that the defendants stopped concealing their activities from plaintiffs in 2002, not that plaintiffs—or more specifically, the Arkansas Attorney General—actually knew of defendants' activities as of 2002. As such, and in the absence of allegations or proof indicating that the State Attorney General affirmatively had knowledge of defendants' conduct prior to April 8, 2003, the antitrust claims alleged on behalf of indirect purchasers are viable at this time.

Having ascertained that plaintiffs' claims on behalf of indirect purchasers pursuant to the Arkansas antitrust statute may proceed, the court turns to plaintiffs' indirect purchaser claims pursuant to the Arkansas consumer protection statute—ADTPA. *See* Ark.Code Ann. § 4–88–101 et seq.

While both parties rely on non-controlling authority for support of their contrary positions, plaintiffs rely on the only case cited by the parties that specifically considered whether antitrust indirect purchaser claims may be asserted pursuant to ADTPA. *See In re New Motor Vehicles Canadian Export Antitrust Litig.,* 350 F.Supp.2d 160, 178–79 (D.Me.2004). The *In re New Motor Vehicles* court stated: there is "no support in the ADTPA or Arkansas case law for a ban on indirect purchaser suits. The ADTPA provides a private cause of action for damages for any person injured by a violation of the ADTPA, and is not limited to a cause of action for direct purchasers." The court also noted that Arkansas "does not prohibit indirect purchaser suits under its antitrust laws." *See id.*

Given that *In re New Motor Vehicles* is the only case to construe indirect purchaser claims under the ADTPA in light of the amended Arkansas antitrust statute, and in view of defendants' failure to cite any

directly contrary authority insofar as the ADTPA is concerned, the court finds *In re New Motor Vehicles* persuasive. For these reasons, and in view of the fact that Arkansas' antitrust statute additionally allows for plaintiffs' indirect purchaser claims as alleged in the instant complaint, the court concludes that plaintiffs' claim under the ADTPA, on behalf of indirect purchasers, is viable and may proceed.

Accordingly, the court hereby DENIES defendants' motion to dismiss plaintiffs' indirect purchaser claims pursuant to Arkansas' antitrust and consumer protection statutes. The denial with respect to the antitrust statute is without prejudice, as the issue may be revisited on summary judgment should discovery reveal that the Attorney General had actual knowledge of the claims before the effective date of the statute.

c. Florida

 Plaintiffs assert a claim pursuant to Florida's Antitrust Act, brought by plaintiff State Florida, and on behalf of its natural persons, state agencies, and political subdivisions. See Fla. Stat. Ann. §§ 542.18 and 542.22; *see also* FAC at ¶¶ 134–39. Defendants seek to dismiss it, arguing that to the extent the claim seeks damages on behalf of indirect purchasers, Florida courts have expressly held that indirect purchaser standing is barred under the Act. Plaintiffs respond by pointing to the portion of their complaint alleging that Florida's state agencies and political subdivisions were the recipients of valid claim assignments executed by direct purchaser OEMs. Plaintiffs contend that, by virtue of these assignments, any claims on behalf of state agencies and political subdivisions are direct purchaser claims, not indirect purchaser claims, thereby justifying recovery pursuant to Florida's Antitrust Act.

Preliminarily, defendants are correct—and plaintiffs do not dispute—that Florida's Antitrust Act prohibits indirect purchaser standing. *See Mack v. Bristol–Myers Squibb Co.*, 673 So.2d 100, 103 (Fla. Dist.Ct.App.1996) (neither plaintiff nor ·court "challenge[d] the trial court's conclusion that under [*Illinois Brick*, plaintiff] and the others in her class, all of whom are indirect purchasers, cannot bring a Florida antitrust claim"). As such, the only issue before the court is whether plaintiffs have adequately alleged direct purchaser claims under the Act, as opposed to indirect purchaser claims.

With respect to claims brought by plaintiff State on behalf of state agencies and political subdivisions, the court finds that plaintiffs have satisfactorily done so. Plaintiffs' direct allegations under the Act leave much to be desired; there is not a single allegation that adequately describes or even alludes to the direct/indirect purchaser status of any of the persons/entities on whose behalf plaintiffs purport to bring suit. *See* FAC at ¶¶ 134–39. Nonetheless, despite this lack of clarity, the court is persuaded that the allegations contained in paragraphs 106 through 108 of the complaint *do* adequately state that Florida's state agencies and political subdivisions are proceeding as direct purchasers, by virtue of certain assignment clauses contained in executed contracts. Accordingly, to the extent that plaintiffs seek recovery under the Florida Antitrust Act on behalf of state agencies and political subdivisions, it is reasonable to infer that plaintiffs are seeking such recovery as direct purchasers, pursuant to the same assignment clauses that plaintiffs allege earlier in the complaint. If this is indeed the case, those claims may proceed under the Act.

To the extent, however, that this is not the case, and plaintiffs in reality seek recovery on behalf of state agencies and

political subdivisions who do not invoke direct purchaser status, such claims must fail. For as noted above, only direct purchasers may sue under Florida's Antitrust Act, and any indirect purchaser claims brought on behalf of state agencies and political subdivisions are accordingly barred.

Indeed, this is the conclusion that the court reaches with respect to plaintiffs' claims pursuant to Florida's Antitrust Act on behalf of natural persons. Plaintiffs' complaint alleges these claims, in addition to claims brought on behalf of government entities. Despite the fact that defendants' motion to dismiss is also aimed at them, however, plaintiffs' opposition mentions nothing about them—perhaps because plaintiffs' complaint is completely silent on the question whether claims brought on behalf of natural persons are brought as direct/indirect purchaser claims. At any rate, given the lack of either argument or allegation establishing that claims brought on behalf of natural persons under the Act are direct purchaser claims, the court finds it more likely than not that plaintiffs' complaint alleges indirect purchaser claims on behalf of natural persons. As such, defendants' arguments in favor of dismissing all such claims is well-taken, in view of *Mack v. Bristol–Myers Squibb Co.*

Accordingly, the court concludes that, to the extent that plaintiffs' complaint alleges (1) claims on behalf of state agencies and political subdivisions who do not invoke direct purchaser status by virtue of direct claim assignments or otherwise; and (2) indirect purchaser claims on behalf of natural persons, defendants' motion is granted and all such claims under the Florida Antitrust Act are hereby DISMISSED. Plaintiffs' claims under the Act may proceed, however, with respect to state agencies, political subdivisions, and natural persons who seek recovery as direct purchasers.

#### d. Hawaii

■ Plaintiffs assert a claim, brought by the Hawaii Attorney General on behalf of all state agencies, pursuant to Hawaii Revised Statute § 480–2 et seq. *See* FAC at ¶ 140. Defendants challenge this claim, to the extent it includes claims on behalf of indirect purchasers. While they acknowledge that Hawaii's antitrust statute permits indirect purchasers to sue for damages, and further permits the State Attorney General to sue as parens patriae on behalf of indirect purchasers who are natural persons, they assert that the statute does *not* similarly recognize indirect purchaser standing for suits on behalf of government entities. Plaintiffs, for their part, object to defendants' challenge, referring to the broad rights granted to all indirect purchasers under the statute, as indicated by the legislative history and the statutory language.

The court's resolution of this issue begins and ends with the plain language of Hawaii's antitrust statute. The statute provides: "The [A]ttorney [G]eneral may bring an action on behalf of the [s]tate or any of its political subdivisions or government agencies to recover the damages provided for by this section, or by any comparable provisions of federal law." *See* Haw. Rev.Stat. § 480–14(b). Accordingly, it is clear from the outset that the State Attorney General is expressly empowered to bring suit under the state antitrust statute on behalf of government entities. This says nothing, however, regarding suits on behalf of government entities who are indirect purchasers. For guidance as to this indirect purchaser issue, the court must look to section 480–14(c) of the statute, which separately grants the Attorney General the express right to bring "a class action for indirect purchasers asserting claims under this chapter." *See* Haw.Rev. Stat. § 480–14(c). In granting this ex-

press right, however, the statute also limits such actions to those brought on behalf of natural persons only. *See id.* ("Actions brought under this subsection shall be brought as parens patriae on behalf of natural persons residing in the State"). Accordingly, and considering each of the foregoing provisions of the state antitrust statute, the statute appears to limit actions brought by the Attorney General on behalf of indirect purchasers to those on behalf of natural persons. They do not encompass state government entities—on whose behalf the Attorney General is also permitted to sue, by way of a separate provision that contains no authorization for indirect purchasers.

In sum, then, the court concludes that plaintiffs' claim, brought by the Hawaii Attorney General on behalf of its state agencies, is barred to the extent it seeks relief on behalf of indirect purchasers. Defendants' motion to dismiss such claims is granted, and the claims are accordingly DISMISSED.

### e. Kentucky

██ Plaintiffs assert claims pursuant to both the antitrust and consumer protection provisions of Kentucky's Consumer Protection Act. *See* Ky Rev. Stat. Ann. §§ 367.175, 367.170; *see also* FAC at ¶¶ 145–46. These claims are brought by plaintiff State Kentucky on behalf of itself and its state agencies and political subdivisions, and as parens patriae on behalf of natural persons within the state. *See* FAC at ¶ 145. Defendants claim that, to the extent indirect purchaser claims are alleged under both statutes, they must be dismissed, since Kentucky does not recognize indirect purchaser standing.

For support of their argument that dismissal of indirect purchaser claims is required, defendants cite *In re Microsoft Corp. Antitrust Litig.*, and *In re New Motor Vehicles.* *See* 241 F.Supp.2d 563, 565

(D.Md.2003); 350 F.Supp.2d at 186 n. 39. Both cases held that indirect purchaser claims are prohibited, regardless whether they are brought pursuant to the state's antitrust or consumer protection provisions. *See id.* Although neither case emanates from a court with any controlling authority over Kentucky state law, they both rely on an unpublished decision that *does* emanate from a controlling jurisdiction, and which specifically holds that indirect purchaser standing is prohibited under Kentucky law—i.e., the Kentucky Court of Appeal's opinion in *Arnold v. Microsoft Corp.*, 2001 WL 1835377 at *3, 7 (Ky.Ct.App. Nov. 21, 2001) (holding that *Illinois Brick* bars suits by indirect purchasers under Kentucky's version of the Sherman Act and Kentucky's Consumer Protection Act).

In response, plaintiffs urge the court to ignore all of defendants' cited case law, since the *Arnold* decision at the heart of all of them is unpublished and not available for citation pursuant to Kentucky's rules of civil procedure. Rather, plaintiffs direct the court's attention to *Federal Trade Comm'n v. Mylan Laboratories, Inc.*, 99 F.Supp.2d 1, 6 (D.D.C.1999). According to plaintiffs, *Mylan* recognizes the authority of the Kentucky Attorney General to bring claims pursuant to the Consumer Protection Act, on behalf of Kentucky citizens.

On the whole, the court finds that defendants have the better argument. It is true, as plaintiffs contend, that the *Arnold* decision is unpublished and thus has limited precedential value in Kentucky. *See* Ky. R. Civ. P. 76.28(4)(C). However, both *In re Microsoft Corp.* and *In re New Motor Vehicles* relied on *Arnold* substantively, and as the only Kentucky guidance directly on point. This court therefore relies on *Arnold* to the same extent as *In re Microsoft Corp.* and *In re New Motor*

*Vehicles,* finding these cases instructive. *Mylan,* by contrast, is not as helpful, as it is a district court case that relies on off-point Kentucky authorities, and pre-dates the *Arnold* decision, at any rate.

Accordingly, and in the absence of directly contrary authority, the court adopts *Arnold's* underlying reasoning here, and holds that indirect purchaser standing is prohibited under the antitrust and consumer protection provisions of Kentucky's Consumer Protection Act. All indirect purchaser claims asserted under either statute are therefore DISMISSED.

f. Louisiana

■ Defendants move to dismiss all claims brought on behalf of indirect purchasers under Louisiana's antitrust statute. *See* La.Rev.Stat. Ann. 51:122 et seq.; *see also* FAC at ¶ 147. Defendants argue that, pursuant to the Fifth Circuit's holding in *Free v. Abbott Laboratories, Inc.,* indirect purchaser standing does not exist under the Act. *See* 176 F.3d 298 (5th Cir. 1999). Plaintiffs respond that a decision by a federal court of appeal is not controlling on state law interpretation, and that Louisiana's antitrust statute must be interpreted instead *in pari materia* with the Louisiana Unfair Trade Practices and Consumer Protection Act, which *would* allow indirect purchasers to sue.

In *Free,* the Fifth Circuit interpreted Louisiana state law, and concluded that Louisiana state courts would hold that indirect purchasers of consumer products lack standing under the state antitrust statute to pursue price fixing claims. *See* 176 F.3d at 299 ("In our best judgment, the Louisiana courts would follow the federal indirect purchaser rule and deny standing to the appellants"). In arriving at this conclusion, the Fifth Circuit engaged in a thorough discussion of relevant Louisiana precedent, and noted that the Louisiana Supreme Court had previously

found federal precedent useful in interpreting state antitrust statutes that were analogous to federal antitrust statutes. *See Louisiana Power & Light Co. v. United Gas Pipe Line Co.,* 493 So.2d 1149, 1158 (La.1986) ("the United States Supreme Court's interpretation ... should be a persuasive influence on the interpretation of our own state enactment."). The Fifth Circuit then went on to hold that, since the federal antitrust statute contains language virtually identical to Louisiana's antitrust statute, the United States Supreme Court's finding that indirect purchaser standing is prohibited under the Clayton Act, should also extend to interpretation of the state antitrust statute.

*Free* is not a decision of the Louisiana state courts, as plaintiffs point out. Nonetheless, the opinion issues from the highest federal court of appeals with jurisdiction over Louisiana. Indeed, the Fifth Circuit is well-versed in applying Louisiana law, and is undoubtedly better-situated than this court to predict how Louisiana courts would interpret questions of state law. As such, the court finds *Free*'s reasoning instructive in interpreting Louisiana's antitrust statute, and is persuaded that the statute should be interpreted so as to deny indirect purchaser standing for plaintiffs' claims brought pursuant to that statute.

Moreover, although plaintiffs are correct that federal precedent is not controlling on state law interpretation, plaintiffs have not actually cited any precedent that *is* controlling, and that argues against the interpretation adopted by *Free* and urged on this court by defendants. In other words, plaintiffs have offered no convincing authority that indirect purchasers *should* have standing under Louisiana's antitrust statute.

At best, plaintiffs can only point to Louisiana's consumer protection statute— which expressly defines trade or commerce

covered under the statute to include indirect purchasers—and argue that its definitions should be read into the antitrust statute on the theory that the two statutes must be read *in pari materia.* The court, however, finds this argument unavailing. It is true enough that Louisiana law requires statutes to be construed in harmony with each other where possible, *see* La. Civ.Code Ann. art. 13 ("Laws on the same subject matter must be interpreted in reference to each other."); *see also City of Opelousas v. Waterbury,* 674 So.2d 1128, 1133 (La.Ct.App.1996) (Courts have duty to harmonize and reconcile statutes if possible). However, it is simply not true that this principle of construction requires or permits—as plaintiffs urge here—the definitions contained in one law to be imported wholesale into another law.

Moreover, the court is not persuaded that the two statutes at issue—Louisiana's antitrust statute and its consumer protection statute—must by force be harmonized here. The two statutes have different goals and regulate different activity, even though they may generally be related to commerce and/or trade. As such, it is not necessarily problematic to hold that the former does not allow for indirect purchaser standing, even if the latter does. Indeed, defendants do not even seek dismissal of plaintiffs' consumer protection claim. Accordingly, plaintiffs do not lose any right available to them as indirect purchasers under that statute, as a result of the court's conclusion that they are prohibited from asserting indirect purchaser claims under the antitrust statute.

In sum, then, and in view of all the above, the court adopts the Fifth Circuit's reasoning as expressed in *Free,* and holds that indirect purchaser standing is unavailable to plaintiffs under Louisiana's antitrust statute. All indirect purchaser claims asserted pursuant to that statute are accordingly DISMISSED.

### g. Maryland

■ Plaintiffs bring claims pursuant to Maryland's Antitrust Act ("MATA"). *See* Md. Com. Law Code Ann. § 11–201 et seq. The claims are brought by plaintiff State Maryland, on behalf of itself, its state agencies and political subdivisions, and as parens patriae on behalf of all natural persons who purchased DRAM or DRAM-containing products. *See* FAC at ¶¶ 149–51. Defendants target all claims except for those brought on behalf of the state itself, to the extent they seek relief on behalf of indirect purchasers. Defendants argue that indirect purchaser standing under MATA has been flatly rejected by Maryland courts. Plaintiffs, by contrast, insist that MATA expressly authorizes the Attorney General to seek both restitution and damages on behalf of indirect purchasers.

MATA allows the Attorney General to enforce the Act by instituting proceedings in both law and equity. With respect to equitable relief, the Attorney General is specifically authorized to commence equity proceedings "to prevent or restrain violations" of MATA, and is further authorized to seek equitable remedies from the court, including injunctive relief and "restitution to *any* person of any money or real or personal property...." *See* Md. Com. Law Code Ann. § 11–209(a)(1). MATA also contains a separate subsection on civil enforcement, however, that expressly authorizes actions for monetary damages. This section allows the Attorney General to file an action for damages "on behalf of the State or any of its political subdivisions or as parens patriae on behalf of persons residing in the State...." *See id.* at § 11–209(b)(2)(ii)(5). In sum, then, the Maryland Attorney General is empowered to bring (1) suits in equity in the name of the state and its state agencies and political subdivisions; and (2) suits for damages on

behalf of the state and its government entities, or in a parens patriae capacity on behalf of natural persons.

The issue before the court is whether MATA contemplates that suits brought by the Attorney General may include indirect purchasers. On balance, the court finds that they may not.

In *Davidson v. Microsoft Corp.*, a Maryland appellate state court held that "only direct purchasers may bring suit to recover an alleged illegal overcharge." *See* 143 Md.App. 43, 792 A.2d 336, 344 (2002). Although *Davidson* involved a private suit under the statute and not an action filed by the Attorney General, the suit was nonetheless brought under the same general statutory enforcement subsection that plaintiffs invoke here. *See* Md. Com. Law Code Ann. § 11–209. For that reason, and since the decision stems from a controlling jurisdiction, the court finds *Davidson* persuasive here, and adopts its reasoning that only direct purchasers are authorized to bring suit under MATA.

Furthermore, at least one federal court, has expressly rejected the Maryland Attorney General's attempt to sue on behalf of indirect purchasers, based on *Davidson*. *See In re Relafen Antitrust Litigation*, 225 F.R.D. 14, 25–26 (D.Mass.2004). While this decision issues from a non-controlling jurisdiction, the court finds it persuasive, in view of *Davidson*. Plaintiffs, for their part, have not submitted any contrary authority that would support a differing construction of MATA.

For these reasons, plaintiffs' indirect purchaser claims pursuant to MATA are hereby DISMISSED.

h. Oklahoma

Plaintiffs assert claims pursuant to both the Oklahoma Antitrust Reform Act and the Oklahoma Consumer Protection Act. *See* Okla. Stat. Ann. 79, § 201 et seq.; Okla. Stat. Ann. 15, § 751 et seq.

Plaintiffs' claims are brought on behalf· of all natural persons and state agencies. *See* FAC at ¶ 175. Defendants challenge plaintiffs' claims pursuant to both statutes to the extent they seek recovery on behalf of indirect purchasers, arguing that Oklahoma state courts have specifically interpreted both statutes to preclude indirect purchaser standing. In response, plaintiffs concede that neither statute allows indirect purchaser claims for damages to go forward, but assert that Oklahoma's Consumer Protection Act does allow for indirect purchaser claims for restitution and other equitable relief.

Plaintiffs' arguments fail. For as defendants note, at least one Oklahoma state court has expressly held that indirect purchaser standing under both the Oklahoma Antitrust Reform Act and the Oklahoma Consumer Protection Act is barred. *See Major v. Microsoft Corp.*, 60 P.3d 511, 512–13 (Okla.Civ.App.2002) (affirming trial court's finding that *Illinois Brick* applied to Antitrust Reform Act and that plaintiff could not make end-run around *Illinois Brick* by alleging same claim under the Consumer Protection Act). This case is controlling, and compels the conclusion that plaintiffs' indirect purchaser claims under both Oklahoma statutes must be dismissed for lack of standing.

Plaintiffs themselves appear to concede the inevitability of this conclusion, as their opposition omits entirely any argument that either statute permits damages, and contains only a suggestion that equitable relief is nonetheless available under the Consumer Protection Act. Even as to this latter point, however, plaintiffs' argument falters. Plaintiffs, for example, rely exclusively on *Mylan* for support. *See* 99 F.Supp.2d at 8–9. But *Mylan* is a non-controlling case that was decided approximately three years *prior* to *Major*, the decision expressly holding that Oklahoma's

Consumer Protection Act is unavailable to indirect purchasers asserting claims based on antitrust violations. *Mylan* is therefore outdated, in addition to the fact that it issues from a court with no controlling authority over Oklahoma law. As such, it cannot be used to help plaintiffs overcome the Oklahoma court's pronouncement in *Major*—or this court's resulting conclusion that all indirect purchaser claims, regardless whether they seek monetary or equitable relief, are barred pursuant to Oklahoma's antitrust and consumer protection statutes.

Accordingly, plaintiffs' claims on behalf of indirect purchasers, pursuant to both statutes, are hereby DISMISSED.

### i. Virginia

■ Plaintiffs assert a claim pursuant to the Virginia Antitrust Act, brought by plaintiff Commonwealth of Virginia on its own behalf, and on behalf of state agencies and political subdivisions who purchased DRAM or DRAM-containing products. *See* Va.Code Ann. § 59.1–9.15(a–c); *see also* FAC at ¶ 188. Defendants contend that the claim must be dismissed because, while there is no law or statute explicitly prohibiting indirect purchaser standing, Virginia has no *Illinois Brick* repealer statute, and the Antitrust Act contains a harmonization provision requiring that the statute be interpreted in accordance with federal law. All of which, say defendants, requires the conclusion that the Virginia Antitrust Act should be construed in conformity with the federal *Illinois Brick* prohibition on indirect purchaser standing. Plaintiffs, in response, state that the Virginia Attorney General has express statutory authority under the Act to represent all indirect purchasers in Virginia—including, presumably, all state agencies and political subdivisions.

The Virginia Antitrust Act is, as defendants point out, silent on the specific question whether indirect purchasers have standing to bring suit under the Act. *See* Va.Code Ann. § 59.1–9.1 et seq. In the face of this silence, the court looks to the surrounding language of the Act, along with the relevant legal authority cited by the parties, for some clue as to whether standing for indirect purchasers should be inferred. Ultimately, and for the reasons cited below, the court concludes that indirect purchaser standing should not be inferred.

First, defendants are correct that the Antitrust Act contains a construction provision that mandates that the Act "shall be applied and construed to effectuate its general purposes in harmony with judicial interpretation of comparable federal statutory provisions." Va.Code Ann. § 59.19.17. And since defendants are further correct that the Antitrust Act's provision governing civil suits for injunctive relief and damages is substantively similar to the federal antitrust provision that was construed to prohibit indirect purchaser standing in *Illinois Brick*, it stands to reason that the Virginia Antitrust Act should similarly be construed to prohibit indirect purchaser standing. *See* Va.Code Ann. § 59.1–9.12; *cf.* 15 U.S.C. § 15. Such a construction has the added benefit of doing the least amount of violence to the existing state of law in Virginia, by avoiding any unwarranted expansion of the rights available pursuant to Virginia's Antitrust Act, at least until Virginia courts themselves have the occasion to weigh in on the issue.

Moreover, contrary to what plaintiffs would have this court believe, they have not actually established that the Virginia Attorney General has express statutory authority under the Antitrust Act to represent Virginia indirect purchasers, including state agencies and/or political subdivisions. To be sure, the Act does provide express

statutory authority for the Attorney General to bring suit on behalf of the Commonwealth, political subdivisions, or natural persons for violation(s) of the Act. *See* Va.Code Ann. § 59.1–9.15. As noted above, however, the statute is silent on the indirect purchaser question specifically. It therefore cannot be viewed as providing "express statutory authority" for indirect purchaser claims brought by the Virginia Attorney General.

Nor have the parties cited, or the court discovered, any legal authority that *would* provide plaintiffs with the express authority they are looking for. Plaintiffs rely on two non-controlling cases, *In re Cardizem CD Antitrust Litig.*, and *In re Lorazepam & Clorazepate Antitrust Litig.* *See* 218 F.R.D. 508, 521 (D.Mich.2003); 205 F.R.D. 369, 386 (D.D.C.2002). Both cases, however, held only that under the Virginia Antitrust Act, the Attorney General has the "express state statutory authority to represent consumers in a capacity that is the functional equivalent of parens patriae authority." *See In re Cardizem*, 218 F.R.D. at 521; *In re Lorazepam*, 205 F.R.D. at 386. This is accurate. *See* Va.Code Ann. § 59.1–9.15(d). It is not to be confused, however, with an express grant of statutory authority to represent *indirect purchasers* specifically.

In sum, then, and for the above reasons, the court concludes that the Virginia Antitrust Act does not provide for indirect purchaser standing in the instant action, and plaintiffs' claims, to the extent they state indirect purchaser claims under the Act, are DISMISSED.

#### j. Washington

■ Plaintiffs allege a cause of action pursuant to Washington's Consumer Protection Act, brought by plaintiff State Washington on behalf of itself, its state agencies, and all natural persons who purchased DRAM and DRAM-containing products. *See* Wash. Rev.Code § 19.86; *see also* FAC at ¶ 189. Defendants assert that all indirect purchaser claims under the statute must be dismissed, pursuant to *Blewett v. Abbott Labs*—a Washington state appellate decision they claim prohibits indirect purchaser standing. *See* 86 Wash.App. 782, 938 P.2d 842, 844 (1997). Plaintiffs, for their part, challenge defendants' characterization of Washington case law, and argue that indirect purchaser standing has been expressly recognized in cases like this one, which are brought by way of an Attorney General's suit.

The court's analysis begins with discussion of Washington's case law, for the parties have both relied on Washington cases for support of their contrary arguments, and where possible, the court endeavors to follow the guidance provided by controlling jurisdictions.

In *Blewett v. Abbott Labs*, relied on by defendants, a state appellate court considered head-on the question whether indirect purchaser standing exists under the state's Consumer Protection Act. *See generally* 86 Wash.App. 782, 938 P.2d 842. The court answered this question in the negative, concluding that indirect purchasers do not suffer "cognizable injury" under the Act. The court was emphatic: "[a]n indirect purchaser is not injured for the purpose of an antitrust claim, not injured for the purpose of a unfair trade claim, and not injured for the purpose of injunctive relief." *See id.* at 847. The court limited this holding, however, to actions brought under section 19.86.090 of the statute—the provision of the Act that governs civil suits for damages. *See* Wash. Rev.Code § 19.86.090 ("Any person who is injured in his or her business or property by a violation of [the Act] ... may bring a civil action" for injunctive relief and/or damages). In the *Blewett* court's view, the prohibition on indirect purchaser standing

stemmed from that provision's express language requiring any "person" bringing suit under the Act to "be injured in his or her business or property." *See id.* Since that language is absent, however, from other sections of the statute—specifically, the provisions of the Act governing suits by the Attorney General—the prohibition on indirect purchaser standing does not extend to these sections. *See, e.g.,* Wash. Rev.Code § 19.86.090 (second paragraph) ("Whenever the state of Washington is injured, by reason of a violation of [the Act] ... it may sue therefor in the superior court to recover the actual damages sustained by it ..."); § 19.86.080 (attorney general may bring action in name of the state to restrain and prevent unlawful conduct under the Act). To that end, the court directly implied that indirect purchasers who are barred from seeking damages under section 19.86.090 of the statute may seek relief via Attorney General actions. *Id.* ("If direct purchasers decide not to sue, the indirect purchaser is not entirely without a remedy ... We conclude that direct purchasers and the attorney general are the enforcers of antitrust law in Washington.").

This same result was contemplated earlier by a Washington superior court in *State v. American Tobacco Co., Inc.,* 1996 WL 931316 (Wash.Super.Ct. Nov. 19, 1996). This case, relied upon by plaintiffs, concerned the State of Washington's suit for damages against numerous tobacco defendants who had allegedly conspired to prevent the development and sale of safer tobacco products. The state was seeking recovery for the increased healthcare costs that it claimed had resulted from state consumers' use of unsafe tobacco products. *See* 1996 WL 931316 at *1. Although the State of Washington was not a purchaser in the allegedly restrained market—i.e., the market for tobacco products—the court nonetheless took the opportunity to analyze the indirect purchaser standing is-

sue vis-a-vis the Consumer Protection Act. The court framed the question before it as follows: "whether the 'antitrust injury' and/or 'direct purchaser' tests are applicable to a claim brought under the section of the [Consumer Protection Act] authorizing damage actions by the State whenever it is 'injured.' " *See id.* at 82.

The court concluded that a direct purchaser requirement was *not* applicable to state actions for damages resulting from indirect injuries. In reaching this decision, the court first noted, as did the *Blewett* court later, that recovery for private plaintiffs pursuant to section 19.86.090 is restricted to direct purchasers, by virtue of that provision's inclusion of language requiring any "person" bringing suit to "be injured in his or her business or property." *Id.* at *3. The *American Tobacco* court then went on to hold, however, that the provision of the Act that authorizes damages suits brought by the state whenever "injured"—i.e., the second paragraph of section 19.86.090—is not restricted to direct purchasers, because it does not contain "business or property" language similar to the provision governing private actions. As such, the court reasoned that Attorney General actions for damages as a result of indirect injuries are permissible. *See id.* at *3–4. In reconciling the differences between the provisions governing private and state actions, the court stated: "It is ... reasonable to assume that the legislature intended to define indirect injuries as a violation of the [Consumer Protection Act] and then authorized the State, but not private parties, to bring a damage action whenever it was indirectly injured." *Id.* at *4.

The holdings of both the *Blewett* and *American Tobacco* decisions are consistent, and provide guidance to this court. Both cases indicate that, while indirect purchaser standing is prohibited pursuant

to the provision of the Act governing private suits for damages, this same prohibition does not extend to actions brought pursuant to provisions authorizing Attorney General suits, since the language of those provisions does not contain the relevant "business or property" limitation discussed above. Accordingly, the court concludes that plaintiffs' action, brought by the Washington Attorney General on behalf of the state, its state agencies and all persons who purchased DRAM and/or DRAM-containing products, is not barred by the indirect purchaser standing doctrine of *Illinois Brick*.

Defendants urge the court to hold differently, attempting to distinguish *Blewett* and *American Tobacco* to the extent that either or both suggest that Attorney General actions are not subject to a direct purchaser standing requirement. Defendants assert, for example, that insofar as *Blewett* observed that indirect purchasers may seek recovery via the Act's provision governing suits by the Attorney General, the *Blewett* court was referring only to the provision of the Act allowing Attorney General suits for equitable relief—not damages. For support, defendants point to *In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 26 n. 5 (D.Mass.2004). Defendants also claim that *American Tobacco* is irrelevant, since it is not an indirect purchaser case, and therefore failed to implicate the policy concerns encompassed within *Illinois Brick*.

The court is unpersuaded by these challenges. First, defendants read *Blewett* too narrowly. In suggesting that indirect purchasers have standing vis-a-vis Attorney General actions, *Blewett* reasoned that this is because the direct purchaser requirement is compelled by the "business or property" language reflected in the Act's private right of action provision—and which "does *not* exist in the section of the Act that enables actions by the Attorney

General." *See* 938 P.2d at 847 (emphasis added). Although defendants correctly note that *Blewett* referred to the equitable relief provision of the Act in making these observations, the take-away point from *Blewett* should be that all provisions of the Act which enable Attorney General actions and do not contain the relevant "business or property" language, allow for recovery regardless of direct or indirect injury. This is true of the second paragraph of section 19.86.090, which governs civil suits for damages. *In re Relafen* does not compel a contrary conclusion, for it is non-controlling authority that rests on the Massachusetts district court's own "interpretation" of *Blewett*.

As for defendants' contention that *American Tobacco* is irrelevant since the state was not an indirect purchaser, this is not so. Regardless of the state's status as indirect purchaser, the court's analysis and decision addressed head-on the question of indirect purchaser standing under the Act in suits for civil damages brought by the Attorney General. This is precisely the issue before the court here, and a state court decision opining on that issue is not only relevant, it constitutes instructive guidance that this court declines to overlook.

Moreover, the court finds added support for its ultimate conclusion here by way of the Washington state legislature's recent amendments to the provisions of the Act discussed herein. As the court discovered in preparing the instant order, and plaintiffs have since pointed out, the state legislature recently amended sections 19.86.080 and 19.86.090. The amendments make clear (1) that the Attorney General has the express authority to bring parens patriae actions for equitable relief on behalf of natural persons in the state; and (2) the state has authority to institute suits for damages whenever it is injured by viola-

tions of the Act, regardless whether the injuries be directly or indirectly sustained. *See* Wash. Rev.Code §§ 19.86.080 and 19.86.090 (as amended April 17, 2007). While the court does not base its conclusion herein on the strength of these amendments, the court nonetheless finds that the amendments suggest that the state legislature intends for the Consumer Protection Act to be construed so as to give the Attorney General the right to seek recovery for indirect injuries sustained by the state and its citizens, even as individual recovery for indirect injuries continues to be denied.

In sum, and for all the above reasons, the court finds that plaintiffs' claim pursuant to Washington's Consumer Protection Act is permissible, even to the extent it seeks recovery for damages on behalf of indirect purchasers. Defendants' motion to dismiss this claim is therefore DENIED.

#### k. West Virginia

Plaintiffs state claims pursuant to West Virginia's Antitrust Act, and Consumer Credit and Protection Act. *See* W. Va.Code § 47–18–16; W. Va.Code § 47–18–16; *see also* FAC at ¶ 190. Defendants argue that all indirect purchaser claims asserted under both statutes must be dismissed. Specifically, defendants contend that the Antitrust Act is to be construed in accordance with federal law prohibiting indirect purchaser standing, and that the Consumer Credit and Protection Act should not be deemed to provide an alternate remedy. Plaintiffs, in response, point out that the West Virginia Attorney General has promulgated a legislative rule, adopted by the legislature in 1990, that specifically grants indirect purchaser standing, and that such standing should be recognized under both the state antitrust and consumer protection statutes.

Generally speaking, defendants are correct that federal decisional law interpreting the Sherman Act is to be applied in interpreting West Virginia's parallel antitrust statute, and that this application would normally suggest that the state antitrust statute be construed in accordance with *Illinois Brick*. *See* W. Va.Code § 47–18–16; *Gray*, 179 W.Va. 282, 367 S.E.2d 751. However, as plaintiffs point out, this conclusion is called into question by the fact that the West Virginia Attorney General has promulgated a legislative rule expressly *permitting* antitrust suits brought by indirect purchasers. The Attorney General's ability to promulgate such a rule is contemplated by the state's antitrust statute itself, which explicitly grants the Attorney General the right to adopt rules and regulations interpreting and enforcing it. *See* W. Va.Code § 47–18–20 ("[t]he attorney general may make and adopt such rules and regulations as may be necessary for the enforcement and administration of [the statute]").

Moreover, at least two federal courts have found that the West Virginia legislative rule allowing indirect purchaser standing is valid, and should be given effect. *See In re New Motor Vehicles*, 350 F.Supp.2d at 173–75; *In re Terazosin Hydrochloride Antitrust Litigation*, 160 F.Supp.2d 1365, 1376, n. 8 (S.D.Fla.2001). While neither case emanates from a court with jurisdictional authority over West Virginia, they are nonetheless instructive. *In re New Motor Vehicles* is particularly helpful. The federal court there dealt with the precise issue now before the court—i.e., whether indirect purchaser standing is permitted under West Virginia law, in the face of apparent conflict between the State Attorney General's rule, and the harmonization provision of the state antitrust statute. After engaging in a fairly comprehensive overview of West Virginia rules of statutory interpretation and the relevant

legislative history, the *In re New Motor Vehicles* court concluded that, since the harmonization provision at issue did not speak to indirect purchaser standing specifically, but was more broadly worded to provide for a "liberal" general interpretive approach, the State Attorney General's subsequent rule interpreting the statute to allow for indirect purchaser standing was a "permissible" reading of the statute, and entitled to deference. *See id.*

The court applies that reasoning here. Moreover, unless and until this issue is raised and resolved by West Virginia state courts, the West Virginia Attorney General—who is expressly granted the authority to interpret the very antitrust statute at issue here—is entitled to some deference. Accordingly, the court finds that plaintiffs' claims on behalf of indirect purchasers under the state antitrust statute are permissible.

▮ With respect to the state consumer protection statute, however, defendants' arguments are more persuasive. Plaintiffs claim that the statute applies to indirect purchaser claims because "bid-rigging" is considered an unfair or deceptive act or practice that is covered under the statute. As defendants point out, however, bid-rigging is an act that is specifically prohibited by the state's Antitrust Act, not the Consumer Credit and Protection Act. *See* W. Va.Code § 47–18–3. As such, the court does not read this activity to be covered by the Consumer Credit and Protection Act, which is generally intended to apply to conduct that generally "creates a likelihood of confusion or of misunderstanding" regarding goods and services. *See* W. Va. Code § 46A–6–102. This conclusion is further buttressed by the fact that plaintiffs have failed to cite any controlling authority that construes the state consumer protection statute to cover bid-rigging. Moreover, even if bid-rigging *were* covered under the state's consumer protection statute, the fact remains that plaintiffs have not pointed to any allegations in their complaint that affirmatively plead bid-rigging. As a result, the court is compelled to conclude that plaintiffs' indirect purchaser claims under the state consumer protection statute are barred.

In sum, the court finds that the indirect purchaser claims brought pursuant to West Virginia's state antitrust statute are not barred from suit, while the indirect purchaser claims brought pursuant to the state consumer protection statute are DISMISSED. Defendants' motion to dismiss as to both statutes is therefore denied in part and granted in part.

### 2. *Intrastate Activity Allegations*

Defendants also seek dismissal of all claims brought under the state antitrust statutes of Maryland, Mississippi, Tennessee, and Wisconsin.[10] Defendants contend that dismissal of these claims is appropriate because plaintiffs have failed to allege the existence of any "intrastate" activity in connection with each claim, as required by the governing state statutes.

#### a. Maryland

▮ Plaintiffs have alleged a cause of action pursuant to the Maryland Antitrust Act ("MATA"). *See* Md. Com. Law Code Ann. § 11–201 et seq.; *see also* FAC at ¶¶ 149–51. According to defendants,

---

10. Defendants originally sought dismissal of all claims brought pursuant to Illinois' antitrust statute, as well. However, in their reply brief in support of their motion to dismiss, defendants stated that, upon review of the authorities cited in plaintiffs' opposition brief, defendants had decided "not to seek dismissal of Illinois' claims on intrastate commerce grounds" at the present time. Defendants' argument as to Illinois was, and is, accordingly withdrawn.

MATA "is concerned exclusively with intrastate commercial activity," and therefore requires plaintiffs to specifically allege that Maryland's intrastate activity has been affected by defendants' conduct— something that plaintiffs have failed to do. In response, plaintiffs contend that MATA is to be liberally construed and has been interpreted more broadly than defendants suggest, so that allegations of interstate commerce activity—which plaintiffs point out are present in paragraph 29 of their complaint—are sufficient to invoke coverage under the statute.

MATA, similar to federal law, makes it unlawful for a person "[b]y contract, combination, or conspiracy with one or more other persons, [to] unreasonably restrain trade or commerce." *See* Md. Comm.Code Ann. § 11–204(a). However, unlike federal law—which reaches interstate commerce activity—MATA explicitly defines "[t]rade or commerce" to include "all economic activity *within* the State." *See id.* at § 11–201(h) (emphasis added). Indeed, MATA expressly states that its overall purpose is to regulate intrastate, as opposed to interstate, activity. *See id.* at § 11–202(a)(1) (emphasis added) (declaring purpose to be that of "complement[ing] the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest *intrastate* competition."). Given these express limitations, the court interprets MATA to mean what it says—that its reach shall extend over economic activity that is intrastate in nature.

This does not mean that MATA should be read as reaching conduct that is *exclusively* intrastate in nature. For as plaintiffs point out, in its provision setting forth the governing principles to be employed in interpreting and construing MATA, the statute expressly states that, "in deciding whether conduct restrains or monopolizes

trade or commerce or may substantially lessen competition within the State, determination of the relevant market or effective area of competition *may not be limited by the boundaries of the State.*" *See id.* at § 11–202(a)(3) (emphasis added). In other words, in determining whether conduct *within* the state is unlawful under MATA, anticompetitive activity *outside* the state will also be considered.

This brings the court to the central issue presented by the parties' arguments— whether plaintiffs' allegation that defendants "engaged in the business of marketing and selling DRAM throughout the United States," *see* FAC at ¶ 29, is sufficient to allege economic activity *within* Maryland, such that MATA's protections are triggered.

On balance, the court finds that this allegation is not sufficient. It sets forth what is essentially interstate economic activity. As such, while it may be useful to plaintiffs in establishing the scope or character of any violations under MATA, *see, e.g.*, Md. Comm.Code Ann. § 11–201(h), it does not aid plaintiffs in establishing that MATA applies preliminarily. This is because the allegation sweeps too broadly— and without any distinction among the forty plaintiff States—to credibly suggest that economic activity within the State of Maryland has been affected in any way, thereby triggering MATA's protection for economic activity occurring "within the State." Md. Comm.Code Ann. § 11–201(h).

This conclusion is reinforced upon examination of the legal authority cited by the parties. Defendants, for example, have cited *Maryland Staffing Serv., Inc. v. Manpower, Inc.*, a case that expressly holds that MATA targets intrastate conduct, and that dismissed claims under MATA for failure to allege any intrastate conduct. See 936 F.Supp. 1494, 1504–05

(E.D.Wis.1996). While *Maryland Staffing* does not emanate from a controlling jurisdiction, the court finds the case instructive nonetheless. Furthermore, while plaintiffs *have* relied on case law that stems from Maryland state courts, the case law does not intimate, as plaintiffs suggest, that interstate commerce allegations are sufficient, standing alone, to invoke MATA. In fact, none of the state cases relied on by plaintiffs even address the issue whether allegations of interstate or intrastate conduct are necessary to invoke MATA's coverage, although it is true enough that they involved nationwide conspiracies. Indeed, to the extent the issue of intrastate activity is even tangentially mentioned, the cases presume the opposite—that allegations of economic activity or harm within Maryland are prerequisites to invocation of MATA. *See, e.g., Maryland v. Philip Morris Inc.,* 934 F.Supp. 173, 176 (D.Md.1996) (remanding MATA and other claims to Maryland state court, noting that state court had jurisdiction where it alleged "redress for harm inflicted *in Maryland on Maryland residents"*) (emphasis added).

In sum, and in view of all the above, the court concludes: (1) in order to state a claim under MATA, plaintiffs are required to allege that economic activity within the State of Maryland is implicated; and (2) plaintiffs have failed to sufficiently allege as much in their complaint. Plaintiffs' claims pursuant to MATA, as stated in their third claim for relief, are accordingly DISMISSED.

In view of the fact that dismissal of plaintiffs' MATA claim is based on a deficiency that might be cured by amendment, however, the court also grants plaintiffs leave to amend their complaint in order to cure the above pleading deficiency.

### b. Mississippi

█ Plaintiffs assert state law claims pursuant to Mississippi's Antitrust Act. *See* Miss.Code Ann. § 75–21–1 et seq.; *see also* FAC at ¶ 155. As with plaintiffs' claims pursuant to Maryland's antitrust statute, defendants contend that Mississippi's Antitrust Act requires plaintiffs to allege at least some intrastate activity in their complaint, and that plaintiffs have failed to do so. Plaintiffs, in response, assert that Mississippi's Antitrust Act is not limited to intrastate conspiracies. To that end, they claim that as long as they sufficiently allege the presence of a nationwide conspiracy involving interstate commerce, sufficient intrastate effects are established such that a viable claim under Mississippi's Antitrust Act may be stated.

The question whether Mississippi's Antitrust Act applies exclusively to intrastate conduct has not been conclusively decided by Mississippi state courts. As defendants note, the issue was first addressed by the Mississippi Supreme Court in 1914, in the case of *Standard Oil Co. v. State ex rel. Attorney General,* 107 Miss. 377, 65 So. 468 (1914), *overruled on other grounds in Mladinich v. Kohn,* 250 Miss. 138, 164 So.2d 785 (1964). In *Standard Oil,* the court addressed allegations of a nationwide conspiracy to monopolize the trade in petroleum and in petroleum products "throughout the United States and its territories ...". *See id.* Although no petroleum was actually produced in Mississippi, plaintiff alleged that defendants sold and distributed petroleum products in Mississippi after having received the petroleum products in interstate commerce, and that the petroleum products were therefore incorporated into the "general mass of property" located within the State of Mississippi. *Id.* at 471.

In considering whether plaintiff's allegations were cognizable under the Mississippi Antitrust Act, the court preliminarily noted that, in order for an act to be punishable under the Mississippi Antitrust

Act, the act "must have as one of its objects a monopoly in the intrastate trade [of Mississippi] to be accomplished in part at least by transactions which are also wholly intrastate." *See id.* at 471. The *Standard Oil* court then went on to conclude that plaintiff had sufficiently stated a claim under the Act, because the alleged conspiracy to monopolize the petroleum market had "as one of its objects a monopoly of that portion of the trade in petroleum products which lies wholly within the [s]tate of Mississippi, to be accomplished in part at least by transactions lying wholly within the state." *Id.*

While *Standard Oil* may rightly be read to suggest, as defendants contend, that allegations of at least some intrastate activity must be made before the Mississippi Antitrust Act may be invoked, no subsequent case from the Mississippi Supreme Court has ever confirmed this, nor has any published decision emanating from the state courts. Further casting doubt on the import to be given *Standard Oil* is the fact that, as at least one case cited by the parties demonstrates, *Standard Oil*'s reasoning appears to have been largely based on the now discredited "dual sovereignty" view of the Commerce Clause, pursuant to which the exclusive authority of federal law was presumed over all things interstate in nature, and the exclusive authority of state laws presumed over all things intrastate in nature.

Ultimately, the court is persuaded—based on review of the parties' cited authorities and the absence of subsequent controlling authority demanding otherwise—that the Mississippi Antitrust Act should be construed to require allegations of at least some activity or conduct occurring in intrastate commerce or trade. Plaintiffs, for example, rely on *Moore ex rel. State of Mississippi v. Abbott Labs.* *See* 900 F.Supp. 26 (S.D.Miss.1995). In *Moore,* the court declined to hold that the Mississippi Antitrust Act is limited to intrastate conspiracies, and allowed plaintiff's claim to go forward under the Act. Although the claim was allowed to go forward, however, the court did not actually hold that the Act is *not* limited to intrastate conspiracies and furthermore noted that plaintiff's claim was nonetheless supported by allegations of *intrastate* activity. *See, e.g., id.* at 28 (allegations that defendants shared 80% of the Mississippi market allegedly restrained, that defendants conspired to fix prices in Mississippi sales market, and that Mississippi consumers were "grossly overcharged" for products). Likewise, defendants' reliance on *In re Microsoft Corp. Antitrust Litig.,* 2003 WL 22070561 (D.Md.2003), also supports the notion that at least some allegations of wholly intrastate conduct are required under the Mississippi Antitrust Act. *See id.* at *8 ("The question thus becomes whether plaintiffs have alleged at least *some* conduct by [defendant] which was performed wholly intrastate").

Turning, then, to plaintiffs' complaint, such allegations are conspicuously absent. Plaintiffs have nowhere alleged any activity of any kind—sales, purchases, or other activities in trade or commerce—that took place in Mississippi and are in any way related to defendants' allegedly unlawful conduct. Plaintiffs urge the court to overlook this deficiency by arguing that, as in *Standard Oil,* some of the DRAM and DRAM-containing products whose prices were allegedly restrained by defendants here were actually "incorporated into the general mass" of property within Mississippi, and sold there—thereby becoming intrastate sales. This argument, however, is unavailing. While it might ultimately aid plaintiffs in demonstrating that such allegations, if made, state a viable claim under the Antitrust Act, the argument is not a substitute for *alleging* intrastate sales in the first place.

In sum, the court finds that plaintiffs' complaint, since it is wholly devoid of any allegations relating to intrastate trade or commerce, fails to properly allege a claim under the Mississippi Antitrust Act, as contemplated by *Standard Oil* and subsequent interpretations of that case. Accordingly, the court grants defendants' motion on this ground, and plaintiffs' claim pursuant to the Mississippi Antitrust Act is accordingly DISMISSED.

The dismissal is with leave to amend, so that plaintiffs might attempt to cure the deficiency noted above.

### c. Tennessee

■ Plaintiffs' third cause of action states a claim pursuant to the Tennessee Unfair Trade Practices Act ("TTPA"). *See* Tenn.Code Ann. § 47–25–101 et seq.; *see also* FAC at ¶ 184. Defendants argue that plaintiffs have failed to properly allege this claim, since they fail to allege that defendants' conduct affected Tennessee commerce to a "substantial degree," as required by the Tennessee Supreme Court in *Freeman Indus., LLC v. Eastman Chem. Co.,* 172 S.W.3d 512 (Tenn.2005). In response, plaintiffs do not dispute that *Freeman* is controlling authority, or that it requires plaintiffs to allege "substantial effects" on Tennessee commerce. Rather, they contend that their allegation that consumers paid artificially high prices for DRAM and DRAM products, sufficiently alleges that Tennessee commerce has been affected to a substantial degree. *See, e.g.,* FAC at ¶¶ 89–91.

The *Freeman* case dealt with similar allegations of a nationwide price fixing conspiracy, and sought to resolve a motion to dismiss brought against an indirect purchaser plaintiff's claims, including a claim brought under the TTPA. *See* 172 S.W.3d at 516. In ruling on defendant's motion, the *Freeman* court had occasion to pass upon the issue whether the TTPA targets only intrastate commerce and/or activity. The court stated: "The [TTPA] does not contain any language indicating that the legislature intended that the scope of the act be limited to intrastate commerce." *See id.* at 522. The court held, however, that a "substantial effects" standard nonetheless applies to claims under the TTPA, pursuant to which "courts must decide whether the alleged anticompetitive conduct *affects* Tennessee trade or commerce to a substantial degree." *Id.* at 523 (emphasis added).

Since neither party disputes the applicability of either *Freeman* or the substantial effects test enunciated therein to the case at bar, the sole question is whether the substantial effects standard is satisfied here.

*Freeman* compels the court to answer this question in the negative. In *Freeman,* the court applied the substantial effects test and found that plaintiff's allegations—which stated that defendant had taken sales orders and implemented sales to customers at artificially raised prices from its principal place of business in Tennessee—were too "bare" to sufficiently establish that Tennessee commerce was substantially affected. *See id.* at 524. Despite the fact that plaintiff had alleged that the Tennessee defendant had engaged in sales activity within the state, the court found that plaintiff failed to allege that defendant's anticompetitive conduct had any actual effect on Tennessee commerce or, at a minimum, that the Tennessee defendant had manufacturing ties to the product that plaintiff, a New York resident, ultimately purchased at an inflated price. *Id.*

Here, plaintiffs' complaint is completely devoid of any mention of Tennessee commerce. Plaintiffs do not specifically allege that any defendant engaged in sales in Tennessee specifically, that defendants

manufactured any product that Tennessee residents or plaintiffs purchased, or even that Tennessee residents or plaintiffs purchased any product in Tennessee at artificially raised prices. At most, and as plaintiffs themselves note, they have alleged in broadest fashion that "they" paid artificially high prices for DRAM and DRAM-containing products. *See* FAC at ¶¶ 89–91. This allegation, however, is made with no differentiation among particular states as to which plaintiffs and consumers paid the artificially high prices, or even purchased DRAM and DRAM-containing products. In short, the court can glean no allegations that sufficiently describe any connection between defendants' allegedly anticompetitive conduct and Tennessee commerce, or otherwise allege any impact upon Tennessee commerce.

As such, the court concludes that plaintiffs have failed to properly allege that defendants' anticompetitive conduct affects Tennessee trade or commerce to a substantial degree. Plaintiffs' claim brought pursuant to the TTPA must accordingly fail, and is hereby DISMISSED.

As was the case in connection with the court's review of plaintiffs' claim pursuant to MATA, however, dismissal of plaintiffs' TTPA claim is based on a deficiency that might be cured by amendment. The court therefore grants plaintiffs leave to amend their complaint as to this claim.

#### d. Wisconsin

Plaintiffs have alleged a cause of action pursuant to Wisconsin's antitrust statute. *See* Wis. Stat. § 133.03; *see also* FAC at ¶ 191. As part of their claim, plaintiffs allege that defendants' unlawful activity "substantially affected the people of Wisconsin and had impacts within the State of Wisconsin," such that relief is warranted. *See id.* Defendants, however, contend that this general allegation is insufficient to state a claim under Wiscon-

sin's antitrust statute, because plaintiffs are required to demonstrate with more particularized allegations the manner in which Wisconsin commerce was "substantially affected" by defendants' purportedly unlawful conduct. Plaintiffs, for their part, contend that more detailed allegations need not be made, and that their general allegation that the people of Wisconsin were substantially affected, as a result of artificially inflated prices stemming from defendants' conduct, is sufficient. Both parties rely on competing Wisconsin case law for support.

The parties' dispute is capable of ready resolution without resort to that competing case law, thanks to the Wisconsin Supreme Court's recent decision in *Meyers v. Bayer AG,* 735 N.W.2d 448 (Wis.2007). In *Meyers,* the state Supreme Court faced head-on the issue pressed upon this court by the parties—i.e., the degree of detail needed to allege that a defendant's conduct "substantially effects" Wisconsin commerce, such that a claim may be stated under Wisconsin's antitrust statute. The *Meyers* court concluded: "a complaint under the Wisconsin Antitrust Act, where the circumstances involve interstate commerce and the challenged conduct occurred outside of Wisconsin, is sufficient if it alleges price fixing as a result of the formation of a combination or conspiracy that substantially affected the people of Wisconsin and had impacts in this state.... [R]equiring greater specificity [ ] would create a heightened pleading standard for Chapter 133 actions that would bar otherwise legitimate suits, thus undermining the Act's purposes of fostering competition and prohibiting unfair discriminatory business practices." *See* 735 N.W.2d at at 461. The *Meyers* court then went on to hold that plaintiff's allegation that "thousands of Wisconsin residents" suffered harm as a result of defendant's nationwide and anticompetitive

actions sufficiently stated a claim under the Act. *See id.* at 464.

The *Meyers* decision is controlling legal authority that is directly on point: It clearly dictates that, as long as plaintiffs allege in their complaint that defendants unlawfully conspired to fix the price of DRAM, in a manner that substantially affected the people of Wisconsin and had impacts in this state, a claim is stated under Wisconsin's antitrust statute. It matters not that the allegation is bare, so long as it is made. *See id.* at 461–62 ("Turning to [defendant's] contention that the 'substantially affects' standard requires more than 'bare allegations' that indirect purchasers in Wisconsin paid higher prices as a result of the challenged conduct, we disagree.").

With this legal standard in mind, the court turns to plaintiffs' complaint, and finds that the allegations stated therein are sufficient to state a claim under Wisconsin's antitrust statute. Plaintiffs have alleged that defendants engaged in unlawful price fixing in the market for DRAM, that consumers and businesses who purchased DRAM during the conspiracy period paid artificially high prices for DRAM, and that these violations "substantially affected the people of Wisconsin and had impacts within the State of Wisconsin." *See, e.g.*, FAC at ¶¶ 29, 34, 89–91, 191. Under *Meyers*, this is all that is required to state a viable claim pursuant to Wisconsin's antitrust statute.

For these reasons, the court hereby DENIES defendants' motion to dismiss plaintiffs' claims brought under Wisconsin's Antitrust Act, pursuant to their third claim for relief.

### 3. *Timeliness Claims*

Defendants assert that claims brought by the Attorneys General under the state laws of Oklahoma and South Carolina are time-barred. Specifically, defendants argue that, pursuant to the allegations of plaintiffs' complaint, plaintiffs either knew or should have known of defendants' allegedly unlawful conduct as of June 2002. *See* FAC at ¶¶ 4, 40, 49, 84 (allegations regarding DOJ investigation announcements in June 2002 and defendants' fraudulent concealment until June 2002). As of this date, defendants contend that the statutes of limitations began to run under the above States' laws, with the end result that Oklahoma's and South Dakota's claims, filed as part of this action on July 14, 2006, were untimely.

#### a. Oklahoma

Plaintiffs assert a claim pursuant to Oklahoma's Consumer Protection Act. The Act provides a statute of limitations of either one, or three years. *See* 12 Okla. Stat. '95(A)(2) and (A)(4). Assuming that the longer 3 year statute of limitations applies, defendants argue that Oklahoma's complaint should have been filed by June 2005—three years after plaintiffs became aware in June 2002 of the underlying facts supporting plaintiffs' claim in June 2002.

Preliminarily, the court accepts, as do the parties, that the governing statute of limitations is 3 years. This being the case, plaintiffs had three years from the point at which their claim accrued, to file the instant complaint. The critical inquiry, of course, is to determine when plaintiffs' claim accrued.

 Oklahoma recognizes the "discovery rule" which provides that the statute of limitations on a claim does not begin to run until the plaintiff knows or reasonably should have known of its injury due to defendants' conduct. *See, e.g., Lincoln Bank & Trust Co. v. Neustadt*, 917 P.2d 1005, 1009 (1996) ("Discovery rule" in tort cases tolls running of applicable limitations period until damaged party knows, or in exercise of reasonable diligence should

have known, of damage). To establish the accrual date of plaintiffs' claim here, then, the relevant question is whether plaintiffs' complaint discloses the time as of which plaintiffs knew or should have reasonably known of their claim. According to defendants, plaintiffs' allegations regarding the June 2002 announcement of the DOJ's criminal investigation demonstrate that as of June 2002, plaintiffs "became aware" of their claim. Plaintiffs, by contrast, argue that the complaint does not disclose sufficient facts from which to conclude whether plaintiffs knew or should have known of defendants' unlawful conduct as of June 2002.

The court agrees with plaintiffs on this point. None of the allegations of plaintiffs' complaint actually establishes the date when plaintiffs became aware of their claim against defendants. At most, plaintiffs' allegations state only that, as of June 2002, defendants' activity was no longer being concealed from plaintiffs. *See* FAC at ¶ 84. This is not the same, however, as alleging that plaintiffs were actually aware of their claim, or even that they reasonably should have been aware of it. It is likely, for example, that upon learning of defendants' alleged misconduct, plaintiffs would have needed additional time to conduct a reasonable investigation of facts, in order to determine whether they in fact had any claim against defendants. Only after having had sufficient time to do so, could the argument be made that plaintiffs should have reasonably been aware of their legitimate claims. While the court cannot say, without additional facts that discovery may provide, what would constitute a sufficient amount of time for investigation in the context of the instant case, it is clear that, at this juncture, no allegations are present that would allow the court to conclude that plaintiffs should have reasonably been aware of their claim as of June 2002.

Moreover, the court notes that plaintiffs have argued in opposition to defendants' motion that they entered into a tolling agreement with defendants in August 2005. If this is indeed the case, then the question before the court is really whether the allegations of the complaint are sufficient for the court to conclude that plaintiffs should have been reasonably aware of their claims against defendants prior to August 2002. This is a mere two months after the DOJ announced its criminal investigation in June 2002.

Given that a pre-filing investigation of some sort is mandatory, see Federal Rule of Civil Procedure 11, the court is not prepared to find that two months was a sufficient amount of time within which plaintiffs should have reasonably discovered their claims against defendants. Indeed, plaintiffs argue that the earliest date the statute of limitations could have begun to run was May 11, 2005—the date that the first defendant actually pled guilty to violations of the Sherman Act. While it is probable that plaintiffs should have reasonably known of their claims prior to this date, the court is at the very least convinced that plaintiffs may not reasonably have known of their claims by August 2002.

In sum, the court concludes that plaintiffs' complaint fails to set forth any allegations that would allow the court to determine, at the pleading stage, the actual date of accrual of plaintiffs' claim under Oklahoma's consumer protection statute. Accordingly, defendants' motion to dismiss plaintiffs' claim pursuant to Oklahoma's consumer protection statute, on grounds that the claim is time-barred, is DENIED. The denial is without prejudice; the issue may be revisited on summary judgment should discovery reveal facts that establish the actual accrual date.

### b. South Carolina

Plaintiffs bring a claim on behalf of South Carolina, and its state agencies and natural persons, pursuant to the state's Unfair Trade Practices Act ("UTPA"). Like Oklahoma's statute, the Unfair Trade Practices Act is subject to a three year statute of limitations. *See* S.C.Code Ann. § 39-5-150 ("any such claim must be brought 'within three years of discovery of [defendants'] unlawful conduct.'"). Defendants once more assert that plaintiffs' complaint violates this three year deadline.

■ Like Oklahoma, South Carolina has adopted the discovery rule for claim accrual. Indeed, the UTPA's statute of limitations codifies the rule. *See id.; see also Grillo v. Speedrite Prod., Inc.,* 340 S.C. 498, 532 S.E.2d 1, 3 (S.C.App.Ct.2000) (claim must be commenced "within three years after [plaintiffs] knew or by the exercise of reasonable diligence should have known that they had a cause of action"). Defendants are also correct that, under general principles of South Carolina law, "the exercise of reasonable diligence means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *See Grillo,* 532 S.E.2d at 3. South Carolina courts have also said, in interpreting the general personal injury statute of limitations—which also recognizes the discovery rule—that the statute of limitations is triggered "not merely by knowledge of an injury, but by knowledge of facts, diligently acquired, sufficient to put a person on notice of the existence of a cause of action against another." *Id.* This is an objective determination. *Id.*

Applying these principles here, the court comes to the same conclusion as it did with respect to Oklahoma's law. In sum, there is no basis from which to conclude, based on plaintiffs' complaint, that plaintiffs were in fact aware of their claim against defendants as early as June 2002, and the court is furthermore unwilling to find that plaintiffs' should have been aware of their claims by July 2002—a mere month after the DOJ investigation was announced.

Moreover, in determining under South Carolina law whether plaintiffs should have known of their claims against defendants, South Carolina requires an objective factual basis from which to decide whether plaintiffs acted with promptness to diligently acquire facts, such that they could have had sufficient notice of their claim. Since this objective factual basis does not appear in the complaint, the court is not in a position to identify here the date that plaintiffs' claim began to accrue.

For these reasons, the court similarly DENIES without prejudice defendants' motion to dismiss plaintiffs' claim pursuant to South Carolinas UTPA on grounds that the claim is time-barred.

### 4. *Individual State Authority for Parens Patriae Actions*

Finally, defendants target the claims brought by eight different plaintiff States, this time on grounds that those plaintiff States do not permit plaintiffs to allege—as they try to do here—parens patriae actions for damages on behalf of natural persons or businesses. Specifically, defendants contend that the parens patriae claims brought by plaintiff States Arizona, Illinois, Mississippi, New Mexico, North Dakota, South Carolina, Tennessee, and Wisconsin must be dismissed because those states have not expressly authorized their Attorneys General to sue for damages in a parens patriae capacity on behalf of natural persons, consumers, or businesses. *See, e.g.,* FAC at ¶¶ 129, 143, 155, 159, 169, 183–84, 191. The gist of defen-

dants' argument is that, pursuant to Ninth Circuit authority as set forth in *California v. Frito–Lay*, 474 F.2d 774 (9th Cir.1973), no state can recover damages on behalf of individuals or entities absent a specific legislative grant of parens patriae authority. Since no such statutory authority exits in the above named plaintiff States, all such parens patriae claims for damages must fail.

Plaintiffs, in response, argue that contrary to defendants' argument, the Ninth Circuit has acknowledged that states have a parens patriae interest in protecting the health of their citizens by redressing antitrust violations, and that this authority includes the right to seek both damages and injunctive relief. *See, e.g., In re Insurance Antitrust Litig.*, 938 F.2d 919, 927 (9th Cir.1991), *aff'd in part & rev'd in part sub nom. Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). Furthermore, plaintiffs point out that the laws of each of the above states generally grant parens patriae authority to their Attorneys General to act for the benefit of each state's citizens, and that this grant of power is sufficient for the damages claims asserted here.

The issues that the court must therefore resolve are whether, in fact, the Attorneys General of the above plaintiff States must have specific legislative authority prior to seeking damages on behalf of individuals and businesses via parens patriae actions, and if so, whether such authority has in fact been granted.

The court answers the first inquiry in the affirmative. Preliminarily, however, it is worth noting that *Frito–Lay*, on which defendants rely in support of the argument that no state can assert a parens patriae claim for damages without express statutory authority, is not wholly on point. In

*Frito–Lay*, the California Attorney General asserted the right to bring a parens patriae action on behalf of its citizens, in order to recover damages pursuant to section 1 of the Sherman Act. The Ninth Circuit squarely rebuffed this attempt, noting that parens authority to seek injunctive relief is different from parens authority to seek monetary relief, and while the former can be grounded in common law, the latter must be grounded in a legislative grant of authority. *See Frito–Lay*, 474 F.2d at 775–76. To that end, the absence of legislative authority granting the Attorney General the right to institute a parens patriae action for damages meant that no such authority could be presumed.[11]

*Frito–Lay* therefore dealt with parens patriae authority vis-a-vis federal antitrust law. Here, by contrast, plaintiff States are asserting parens patriae authority via individual state laws. As such, while the general principle espoused by *Frito–Lay* is instructive, it is not controlling.

With these distinctions in mind, the court nonetheless concludes that *Frito–Lay*'s general reasoning should govern the court's decision here. To that end, in order to determine whether the Attorneys General here have the authority to bring parens patriae suits for monetary damages on behalf of their citizens, businesses and/or consumers, the court looks to those states' individual laws to determine whether such authority has been provided. Unlike *Frito–Lay*, however, the court does not require that any affirmative grant of authority be rooted solely in statutes. Rather, the court employs the following principle: where there exists controlling legal authority specifically indicating that monetary damages—as opposed to other

---

11. In response to *Frito–Lay*, Congress passed the Scott–Hart–Rodino Act, which *does* specifically grant state Attorneys General the parens patriae authority to sue for monetary damages on behalf of natural persons, pursuant to federal antitrust law.

types of relief—may be sought through a parens patriae claim, the court will presume such authority to be present, regardless whether such authority is indicated by common law, statutory law, or otherwise. Where no such authority exists, however, the court will not make the same presumption.

With the above principles in mind, the court turns to each plaintiff State at issue.

#### a. Arizona

Defendants correctly contend that nothing in Arizona's antitrust statute grants the Attorney General parens patriae authority to bring claims for monetary damages. Arizona's antitrust statute contains two relevant provisions: Ariz.Rev.Stat. §§ 44–1407 and 44–1408. The former grants the Attorney General permission to bring an appropriate action for "injunctive or other equitable relief . . . in the name of the state for a violation of this article," and the latter affirms that "[t]he state, a political subdivision or any public agency threatened with injury or injured in its business or property by a violation of this article may bring an action for appropriate injunctive or other equitable relief, *damages sustained* and . . . [costs and fees]." *See id.* (emphasis added). The first provision governs injunctive and equitable relief, and the second governs damages. Notably lacking from the provision governing damages, however, is any express grant of authority to the state or its Attorney General to bring suit on behalf of "natural persons"—i.e., parens patriae authority. *Cf.* Cal. Bus. & Prof.Code § 16760(a)(1) ("Attorney General may bring a civil action . . . as parens patriae on behalf of natural persons residing in the state").

Plaintiffs respond that, notwithstanding the language of Arizona's antitrust statute, two district courts have held that Arizona has "express statutory authority to represent consumers in a capacity which is the functional equivalent of parens patriae." *See In re Cardizem*, 218 F.R.D. at 521; *In re Lorazepam*, 205 F.R.D. at 386–87. However, plaintiffs' reliance on these cases is misplaced.

First, both cases—neither of which constitutes controlling authority—deal with the ability of State Attorneys General to settle and release parens patriae claims on behalf of consumers, not the ability of State Attorneys General to bring parens patriae claims for damages on behalf of consumers. *See id.* Moreover, the *In re Lorazepam* decision, upon which the *In re Cardizem* decision heavily relies, expressly noted that no challenge to the states' parens patriae authority had been made. This is not the case here.

Second, although it cannot be disputed that both courts found Arizona Revised Statute § 44–1407 to set forth "the functional equivalent of parens patriae" authority, it is equally undisputed that this section, as noted above, provides for actions by the Arizona Attorney General for injunctive and equitable relief in the "name of the state." *See In re Cardizem*, 218 F.R.D. at 521; *In re Lorazepam*, 205 F.R.D. at 386–87; Ariz.Rev.Stat. § 44–1407. Accordingly, even if the court were to credit both courts' finding that statutory authorization for Attorney General actions in the "name of the state" are equivalent to an express grant of parens patriae authority, this would extend only to suits for equitable relief, not damages. Indeed, even applying both courts' reasoning, damages suits *cannot* be authorized, since Arizona's provision governing damages—Ariz. Rev. Stat. § 44–1408—lacks similar language that allows for suits by the Attorney General in the "name of the state."

In sum, therefore, the court concludes that no authority has been presented that expressly authorizes the Arizona Attorney

General to assert a parens patriae claim for damages on behalf of Arizona consumers. Accordingly, to the extent such relief is sought, plaintiff State Arizona's claim is hereby DISMISSED.

#### b. Illinois

The Illinois antitrust statute expressly addresses actions brought by the State Attorney General, and provides that the Attorney General may bring an action "on behalf of this State, counties, municipalities, townships and any political subdivision ... to recover the damages under this subsection or by any comparable federal law." *See* 740 Ill. Comp. Stat. 10/7(2). The statute also provides "that only the Attorney General is authorized to maintain a class action in any court of th[e] State for indirect purchasers...." *Id.* Thus, as does the Arizona antitrust statute, the Illinois antitrust statute nowhere provides the Attorney General with a direct mandate to bring suit in a parens patriae capacity, on behalf of Illinois persons or businesses.

Plaintiffs, for their part, contend that aside from this statute, the Illinois Attorney General *does* have parens authority, and that this authority is rooted in the Attorney General's constitutional and common law powers. In support of this argument, plaintiffs rely on Illinois case law, as well as case law that issues from non-controlling jurisdictions. *See, e.g., People ex rel. Barrett v. Finnegan,* 378 Ill. 387, 392–93, 38 N.E.2d 715 (1941) (recognizing common law power of Attorney General to institute actions affecting the public); *In re Volpert,* 175 B.R. 247, 256 (Bankr. N.D.Ill.1994); *Illinois v. Bristol–Myers Co.,* 470 F.2d 1276, 1278 (D.C.Cir.1972) (Attorney General has legal authority, based on common law powers and duties, to sue for the state "to recover damages wrought by alleged antitrust violations outside the assertedly restrictive terms of the Illinois Antitrust Act"). Plaintiffs also once again invoke *In re Cardizem,* and *In re Lorazepam,* for the proposition that Illinois' antitrust statute conveys to the Attorney General the "functional equivalent" of parens patriae authority. *See* 218 F.R.D. at 521, 205 F.R.D. at 386–87.

With the exception of *Bristol–Myers,* plaintiffs' cited authority largely establishes a proposition with which defendants have no quarrel—i.e., that the State Attorney General is vested with broad common law rights and duties that allow him to institute civil actions for the purpose of vindicating the interests of the state and the public at large. The court has no trouble finding that this is so. It does not, however, answer the question that is actually before the court: whether the broad common law rights and duties vested in the Attorney General allow for parens patriae suits that specifically seek *damages* on behalf of persons or businesses.

*Bristol–Myers* is the only authority relied on by plaintiffs that answers this question in the affirmative. In *Bristol–Myers,* the D.C. Circuit Court of Appeals affirmed the district court's denial of appellants' request for leave to intervene in an action filed by the State of Illinois, seeking treble damages for Sherman Act violations. The state—through the Illinois Attorney General—had brought suit on behalf of all political subdivisions pursuant to Illinois' antitrust statute, and as the class representative for private purchasers and consumers, pursuant to Federal Rule of Civil Procedure 23. *See* 470 F.2d at 1278. Appellants also sought to represent all consumers and purchasers of the products at issue, claiming that the Illinois Attorney General lacked authority under state law to represent the interests of private consumers. *Id.* The appellate court found that the Attorney General was empowered to act as the class representative of private purchasers, once it had properly invoked a lawsuit on behalf of itself and its political

subdivisions under federal law. *Id.* The court then went on to find that, even under Illinois state law, the Attorney General would be empowered to seek relief on behalf of private purchasers, due to the broad duties and powers vested in the Attorney General under state law. *Id.* at 1279.

While *Bristol–Myers* might normally be compelling, however, defendants have pointed the court to more recent Illinois case law that rejects *Bristol–Myers'* reasoning. *See State of Illinois v. Daicel Chem. Indus.*, No. 02 CH 19575 (Ill.Cir.Ct. Sept. 23, 2003), attached as Exhibit 1 to Defendants' Response to Plaintiff State of Illinois' Opp. Re Request for Judicial Notice.[12] The *Daicel Chemicals* court expressly considered the question whether the Illinois Attorney General may assert parens patriae claims on behalf of Illinois citizens in the absence of express authorization in the antitrust statute, and held: "the law of the State of Illinois does not support the Attorney General's argument that parens patriae standing, which covers quasi-sovereign interests, can be used to recover individual injuries to citizens under the Illinois Antitrust Act." *See id.* at 7. In so holding, the Illinois court expressly rejected *Bristol–Myers,* and noted that other courts with jurisdiction over Illinois state law had done the same. *See, e.g., In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1127 (7th Cir.1979) ("In the absence of statutory authorization, Illinois cannot maintain this action in federal court as a[p]arens patriae action"); *In re Rusty Jones, Inc.*, 128 B.R. 1001, 1008 (Bkrtcy.N.D.Ill.1991) ("if [Illinois] has not suffered the same injury as members of the putative class, it may not act on behalf of its citizens unless it is authorized to do so under state statutory law, regardless of whether the state constitution recognizes the role of the State as parens patriae").

So here. As such, in view of plaintiffs' inability to demonstrate that express parens patriae authority to bring claims for monetary damages on behalf of natural persons and businesses has been vested in the Illinois Attorney General, plaintiff State Illinois' parens patriae claim for monetary damages on behalf of natural persons and businesses is hereby DISMISSED.

c. Mississippi

Defendants assert that neither Mississippi's antitrust law nor its consumer protection law grant the State Attorney General the requisite parens patriae authority to sue for damages on behalf of natural persons and businesses. As a practical matter, this is correct; the state consumer protection law allows for Attorney General actions only where the Attorney General is seeking injunctive relief "in the name of the State," while the state antitrust statute appears to limit Attorney General actions brought "in the name of the State" to those seeking the imposition of penalty amounts only. *See* Miss.Code Ann. § 75–24–9 (limiting Attorney General actions to those seeking injunctive relief only); Miss. Code Ann. § 75–21–7 (setting forth penalty for violation of statute).

This does not the end the inquiry, however. Plaintiffs rely on common law and legal precedent holding that the Mississippi Attorney General *is* empowered to bring a parens patriae action for damages on behalf of its natural persons. *See Hood ex rel. Mississippi v. Microsoft Corp.*, 428 F.Supp.2d 537, 545–46 (S.D.Miss.2006) (finding that Mississippi

---

**12.** Plaintiff State Illinois submitted an opposition objecting to defendants' request that the court take notice of the *Daicel Chemicals* decision. The court hereby OVERRULES the objection.

Attorney General had parens patriae authority to bring damages claim under state law, on behalf of state and natural persons); *Moore ex rel. Mississippi v. Abbott Labs.*, 900 F.Supp. 26, 31 (S.D.Miss.1995) (Mississippi Attorney General has parens patriae authority to assert claims on behalf of state). These cases, which issue from federal district courts familiar with Mississippi law, recognized the State Attorney General's parens patriae authority to sue for damages and other relief under the private right of action provisions of the above statutes, despite the lack of any language therein affirmatively granting parens patriae authority. *See id.* As such, the cases are instructive here, and ultimately persuasive.[13]

Accordingly, based on the express authority recognized by Mississippi legal authorities, the court concludes that plaintiff State Mississippi is entitled to pursue its parens patriae claim seeking damages on behalf of natural persons and businesses, and hereby DENIES defendants' motion.

### d. New Mexico

The relevant language of the New Mexico antitrust statute provides: "The attorney general may bring an action under Subsection A of this section on behalf of the state, a political subdivision thereof or any public agency." *See* N.M. Stat. Ann. § 57–1–3. Subsection A in turn grants "any person"—defined as "an individual, corporation, business trust, partnership, association or any governmental or other legal entity with the exception of the state"—the right to sue for injunctive relief *and* damages. *See id.; see also* N.M. Stat. Ann. § 57–1–1.2. In other words, the Attorney General may sue for injunctive

relief and damages on behalf of the state, a political subdivision thereof, or any of its public agencies, and a natural person may sue for damages on his own behalf. The question here, is whether the Attorney General may sue for damages on behalf of natural persons.

Plaintiffs have not relied on any authority that answers this question in the affirmative. *In re Lorazepam* and *In re Cardizem*, both state only that New Mexico is a state that has had a federal court interpret its antitrust statute to effectively "grant parens patriae authority." *See* 205 F.R.D. at 386, 218 F.R.D. at 521. These statements, however, say nothing of the Attorney General's ability to bring a parens patriae suit for damages on behalf of natural persons, and set forth only the generic proposition that the Attorney General is, in fact, vested with parens patriae authority. Likewise, the federal district court opinion that these two cases—and plaintiffs—rely upon also contains no express statement that parens patriae authority for damages actions are authorized, even while expressly recognizing that parens patriae authority is vested in the New Mexico Attorney General. *See State of N.M. v. Scott & Fetzer Co.*, 1981 WL 2167, at *1 (authorizing parens patriae action in order to "*enforce*[ ] of the 'due-on-sale' law") (emphasis added).

In sum, and in the absence of any authority specifically indicating or implying that the New Mexico Attorney General's suit for damages may go forward in a parens patriae capacity on behalf of natural persons, the court concludes that this claim must be, and is hereby DISMISSED.

---

**13.** Defendants have also moved to dismiss plaintiff State Mississippi's parens patriae claims on behalf of businesses specifically, on grounds that the statutes pursuant to which plaintiffs bring suit do not expressly authorize suits on behalf of "businesses." However, since defendants make this argument conclusorily, and provide no controlling authority in support thereof, the court accordingly rejects it.

#### e. North Dakota

North Dakota's antitrust statute has two relevant provisions. First, the statute provides for civil penalties and enforcement by the State Attorney General, who "may bring an action for appropriate injunctive relief and civil penalties in the name of the state for a violation of this chapter." *See* N.D. Cent.Code § 51–08.1–07. Second, the statute provides that an action for damages may be brought by "[t]he state, a political subdivision, or any public agency threatened with injury or injured in its business or property by a violation of this chapter." *See id.* at § 51–08.1–08.

The former provision grants the North Dakota Attorney General the right to bring a suit "in the name of the state." This, as plaintiffs point out, has been relied upon by other district courts as an express grant of authority which is the "functional equivalent of parens patriae." *See In re Cardizem*, 218 F.R.D. at 521; *In re Lorazepam*, 205 F.R.D. at 386–87. However, this provision is also expressly limited to injunctive and equitable relief. It is only the *latter* provision that allows for the recovery of damages, and this provision specifically limits damages actions brought by the Attorney General to those brought on behalf of the state and its government entities—i.e., in the state's own proprietary capacity. *See* N.D. Cent.Code § 51–08.1–08 (omitting all reference to phrase "in the name of the state").

Plaintiffs contend that North Dakota's antitrust statute need not include an express legislative grant of parens patriae authority in order for the Attorney General to sue for damages sustained by North Dakota citizens. Plaintiffs base this assertion on state legal authorities that have recognized the common law right of the state to institute any and all suits when required for the general welfare of the North Dakota citizenry. *See, e.g., State ex rel. Burgum v. Hooker*, 87 N.W.2d 337, 340 (N.D.1957) ("It has been repeatedly held that the [S]tate has the right, independent of any statutory provision, to institute a suit in any of its courts when it is required for the general welfare of its people.").

In making this argument, however, plaintiffs ignore the fact that the common law right of the states to sue as parens patriae on behalf of the general welfare of their people, has not traditionally included suits for monetary damages. *See, e.g., Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. at 600–07, 102 S.Ct. 3260 (describing history of common law parens patriae authority and citing relevant case law, under which state attorneys general sought injunctive relief). Indeed, the recognition that common law parens patriae authority did not embrace damages actions is precisely what led the Ninth Circuit in *California v. Frito–Lay* to decline to allow a parens patriae action for damages to go forward, absent affirmative authorizing legislation. *See* 74 F.2d 777 (parens patriae actions for damages are "not the type of state action taken to afford the sort of benefit that the common law concept of parens patriae contemplates"). This same rationale has led this court, too, to demand that some conclusive authority be present that expressly permits such claims.

To that end, and plaintiffs having failed to present the court with any indication that North Dakota's Attorney General has been vested with the express authority to bring parens patriae suits for damages on behalf of natural persons and/or businesses, the court concludes that any such claim must be and is hereby DISMISSED.

#### f. South Carolina

Plaintiffs assert that South Carolina's Unfair Trade Practices Act ("SCUTPA"), and state common law, vest the South Carolina Attorney General with parens patriae authority to sue for monetary dam-

ages on behalf of natural persons. However, while both sources of law do contemplate that the Attorney General has the authority to bring parens patriae claims, there are no grounds for holding that either contemplates extending parens patriae authority to suits for monetary damages.

SCUTPA, for example, allows the Attorney General to "bring an action in the name of the State against [violators of the statute] to restrain by temporary restraining order, temporary injunction or permanent injunction the use of [any unlawful] method, act or practice." *See* S.C.Code Ann. § 39–5–50(a). On its face, this language condones actions by the Attorney General that seek injunctive relief, not monetary damages. And while it is true, as plaintiffs point out, that SCUTPA also allows courts to issue additional orders restoring to any persons property that was acquired by reason of a defendant's violations of the statute, this provision reaches only equitable relief, as is indicated by use of the word "restore," within a statutory provision targeted at injunctive relief. *See* S.C.Code Ann. § 39–5–50(b) (courts may "make such additional orders or judgments as may be necessary to restore to any person ... any moneys or property, real or personal, which may have been acquired by means of any practice declared to be unlawful in this article").

The conclusion to be reached from this is that, to the degree that the Attorney General may proceed under SCUTPA in a parens patriae capacity on behalf of natural persons—as plaintiffs note is suggested by *In re Lorazepam,* 205 F.R.D. at 386–87—he may only do so in order to seek injunctive relief, not damages.

Consideration of South Carolina common law does not compel a different result. Plaintiffs rely on *Condon v. Hodges,* 349 S.C. 232, 562 S.E.2d 623, 627 (2002). However, while *Condon* does, indeed, embrace the general principle that the State Attorney General has constitutional and statutory authority to bring whatever claims he sees fit in the name of the state, *Condon* did not address monetary damages. Rather, it dealt with the Attorney General's right to bring an equitable claim against the governor of the state. *Id.* This being the case, *Condon's* general affirmation of the Attorney General's parens patriae authority, as recognized at common law, fails to provide support for a finding that such authority extends beyond its normal common law boundaries, to include suits for monetary damages.

In short, the court declines to hold that South Carolina's parens patriae claim for damages on behalf of natural persons may go forward. Such claim is accordingly DISMISSED.

### g. Tennessee

Plaintiffs argue that the Tennessee Attorney General has parens patriae authority to sue for monetary damages on behalf of consumers, by virtue of the Attorney General's status as a constitutional officer, with statutory and common law duties and powers. *See, e.g.,* Tenn.Code Ann. § 8–6–109 (noting constitutional and statutory rights and duties of Attorney General); *State v. Heath,* 806 S.W.2d 535, 537 (Tenn. Ct.App.1990) ("the attorney general may exercise such authority as the public interest may require and may file suits necessary for the enforcement of state laws and public protection").

None of these sources, however, provide express authority for the filing of a parens patriae action for monetary damages on behalf of natural persons or consumers. Indeed, Tennessee's antitrust statute fails to even grant the Attorney General the authority to bring any type of suit under the statute, let alone a parens patriae right suit seeking monetary damages. *See*

Tenn.Code Ann. § 47–25–106 (stating only that "[a]ny person who may be injured or damaged by" unlawful conduct under the statute may sue for and recover "the full consideration or sum paid by the [injured] person for any goods, wares, merchandise, or articles . . . ."). Tennessee's Consumer Protection Act—pursuant to which its Attorney General also brings suit here—does allow for Attorney General actions "in the name of the state" and on behalf of injured citizens, but such relief is limited to injunctive and equitable relief. *See* Tenn.Code Ann. § 47–18–108(a–b). Finally, while it is true that other statutory provisions empower the Attorney General to generally institute all actions necessary to enforce the laws, including actions on behalf of the state and its agencies to recover "public funds," this is not synonymous with the power to seek monetary damages specifically. *See id.* at § 8–6–109 (district attorney empowered to sue on "behalf of the state, local government units or local education agencies to recover public funds from entities financed by such funds and their directors or officers when such funds through the improper actions of such directors or officers have been used for unauthorized purposes, misapplied or misappropriated"). At most, this could be seen as support for the Attorney General's ability to seek equitable relief on behalf of appropriate government entities.

Moreover, as defendants point out, at least one Tennessee court has expressly rejected the very proposition urged by plaintiffs here. In *State ex rel. Leech v. Levi Strauss & Co.*, a Tennessee chancery court expressly considered the State Attorney General's request to seek monetary damages on behalf of private citizens under Tennessee's antitrust laws. *See* 1980 WL 4696, at *4 (Tenn. Ch. Ct.1980). After noting that parens patriae actions had received "no judicial recognition in this country as a basis for recovery of money damages for injuries suffered by individuals,"

the court concluded that "such a drastic departure from accepted practice must result from acts of the Legislature." *Id.* at *5. Finding no affirmative grant of authority to be present in the Tennessee antitrust statute, the court dismissed the Attorney General's parens patriae claim for damages.

The same result is compelled here. For as noted both above and by the Tennessee Chancery Court, there is simply no statutory authority relied on by plaintiffs that expressly grants the Attorney General the right to assert a parens patriae claim for damages on behalf of natural persons or consumers. Absent such authority, Tennessee's parens patriae claim for damages on behalf of natural persons and businesses, is accordingly DISMISSED.

h. Wisconsin

Plaintiffs concede that the Wisconsin Attorney General has no authority to prosecute litigation on behalf of Wisconsin citizens unless such authority is granted by statute. *See, e.g., State v. City of Oak Creek*, 232 Wis.2d 612, 605 N.W.2d 526, 533 (2000). They contend, however, that Wisconsin's antitrust statute expressly grants the Attorney General the authority to prosecute any and all violations of state antitrust law, including the authority to seek monetary redress for consumers harmed by antitrust violations. *See* Wis. Stat. §§ 133.16–133.17.

This is incorrect. The Wisconsin antitrust statute expressly limits the department of justice—which includes the State Attorney General—and district attorneys to suits for injunctive relief only. *See* Wis. Stat. § 133.16. And while it does empower the Attorney General to prosecute any and all violations under the act, the antitrust statute does not define the contours of this authority, stating only that the department of justice shall have all powers conferred

upon district attorneys in prosecuting violations under the act. *Id.* at § 133.17. In other words, there is no express grant of parens patriae authority to sue for damages on behalf of consumers in Wisconsin's antitrust statute.

Plaintiffs also rely on *In re Lorazepam* for the proposition that the Wisconsin antitrust statute expressly grants the Attorney General the "functional equivalent" of parens patriae authority to seek damages on behalf of consumers. For the reasons already detailed above, *In re Lorazepam* is distinguishable, and fails to provide the requisite support.

Accordingly, to the extent plaintiff State Wisconsin asserts a parens patriae claim for damages on behalf of natural persons, this claim is DISMISSED.

### D. Request for Judicial Notice

In conjunction with the instant motion to dismiss, defendants have also submitted a request for judicial notice of various documents that include state legislative reports, legislative bills, and pleadings or decisions filed in unrelated actions. *See* Declaration of Peter Nemerovski ISO Defendants' Request for Judicial Notice. Finding the documents to be appropriate subjects for judicial notice, the court hereby GRANTS defendants' request.

### E. Conclusion

For the foregoing reasons, defendants' motion to dismiss plaintiffs' second and third claims for relief is GRANTED in part, and DENIED in part. Specifically, the court holds as follows:

1. Defendants' motion to dismiss plaintiffs' second claim for relief is GRANTED. To the extent plaintiffs' claim under the Cartwright Act alleges claims on behalf of non-California Attorneys General seeking relief on behalf of non-California residents, state agencies and political subdivisions, plaintiffs lack standing and/or authority to

do so. These claims are therefore DISMISSED with prejudice.

2. Defendants' motion to dismiss plaintiffs' third claim for relief is GRANTED in part and DENIED in part, as follows:

(a) Defendants' motion to dismiss indirect purchaser claims brought pursuant to the antitrust statutes and provisions of Alaska, Florida, Hawaii, Kentucky, Louisiana, Maryland, Oklahoma, and Virginia, is GRANTED, based on those states' adherence to the *Illinois Brick* doctrine. All such claims are DISMISSED with prejudice. However, defendants' motion with respect to the indirect purchaser claims brought pursuant to the antitrust statutes and provisions of Arkansas and West Virginia, is DENIED. The denial with respect to Arkansas is without prejudice to the parties' ability to raise the issue on summary judgment once relevant discovery is completed;

(b) Defendants' motion to dismiss indirect purchaser claims brought pursuant to the consumer protection statutes and provisions of Alaska, Kentucky, Oklahoma, and West Virginia is GRANTED, also based on those states' adherence to the *Illinois Brick* doctrine. All such claims are similarly DISMISSED. Defendants' motion with respect to the indirect purchaser claims brought pursuant to the consumer protection statutes and provisions of Arkansas and Washington, is DENIED;

(c) Defendants' motion to dismiss all claims brought pursuant to the antitrust statutes of Maryland, Mississippi, and Tennessee is GRANTED, based on plaintiffs' failure to allege intrastate activity, as required pursuant to these statutes. These claims are DISMISSED. The dismissal is without prejudice, however, and leave to amend is granted to allow plaintiffs to cure the deficiencies with respect to these claims. Defendants' motion to dismiss plaintiffs' claim pursuant to Wisconsin's

antitrust statute on similar grounds, is DENIED;

(d) Defendants' motion to dismiss all claims brought pursuant to Oklahoma's consumer protection statute and South Carolina's antitrust statute, on grounds that the claims are barred under the applicable statutes of limitations, is hereby DENIED. The denial is without prejudice, however, to the parties' ability to raise the issue on summary judgment, once relevant discovery is complete; and

(e) Defendants' motion to dismiss all parens patriae claims seeking monetary damages on behalf of natural persons and/or businesses is GRANTED in part and DENIED in part. The motion is GRANTED with respect to plaintiff States Arizona, Illinois, New Mexico, North Dakota, South Carolina, Tennessee, and Wisconsin. All such claims are therefore DISMISSED with prejudice. Defendants' motion to dismiss all such claims brought by plaintiff State Mississippi, however, is DENIED.

Leave to amend is permitted *only* as specified herein. Amendment as to additional matters is not permitted without prior leave of court. The court does note, however, that in addition to the complaint's deficiencies highlighted throughout this order, plaintiffs' complaint also appears to suffer from an additional deficiency. Namely, plaintiffs' complaint fails to set forth with any degree of clarity or specificity the nature of DRAM purchases made by any given plaintiff State, its entities, and its citizens (e.g., purchases of free-standing DRAM v. products in which DRAM is a component). While the court believes this deficiency is significant, given that the complaint is already unwieldy and difficult to review or manage, the court declines to order additional amendment on this point at the present juncture.

Any amended complaint shall be filed no later than **October 1, 2007.**

**IT IS SO ORDERED.**